594 A.2d 232
STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SAMUEL ERAZO, DEFENDANT–APPELLANT.

Argued January 29, 1991—Decided August 8, 1991.

113

115

*Michael A. Priarone* and *Michele A. Adubato*, Designated Counsel, argued the cause for appellant (*Wilfredo Caraballo*, Public Defender, attorney).

*Annmarie Cozzi,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

A jury convicted defendant, Samuel Erazo, of capital murder and possession of a weapon for an unlawful purpose. He appealed as of right to this Court. *R.* 2:2–1(a)(3). As the State recognizes, the trial court gave two erroneous charges on the murder count. The instruction concerning manslaughter impermissibly shifted to defendant the burden of proving passion/provocation. *See State v. Grunow,* 102 *N.J.* 133, 506 *A.*2d 708 (1986). Furthermore, the court failed to instruct that defendant could be convicted of capital murder only if he knowingly or purposely caused the death of the victim, as distinguished from knowingly or purposely causing serious bodily injury that resulted in death. *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). Finding that the charges on the issues were supported by a rational basis, we conclude that the errors were not harmless. Consequently, we reverse the conviction for capital murder, but not that for possession of a weapon for an unlawful purpose.

–I–

We restrict our factual recitation to those facts relating to the incorrect jury instructions. The tempestuous marriage of Samuel and Lucy Erazo ended on July 20, 1986, when he stabbed her to death after an evening of drinking and quarrelling. Samuel's primary defense was that she had provoked him and that he had killed her in the heat of passion. As the court and counsel recognized at trial, the case turned on Samuel's mental state at the time of the homicide. More specifically, the question was whether he had knowingly or purposely killed his wife, contrary to *N.J.S.A.* 2C:11–3a(1) and –3a(2), and, if so,

whether he had acted in the heat of passion on adequate provocation, *N.J.S.A.* 2C:11–4b(2).

Samuel and Lucy were married on May 19, 1982, at Rahway State Prison, where he was confined for the 1977 stabbing death of Gladys Colon, the daughter of a woman with whom he had been living. The relationship between Samuel and Lucy was marked by passion, recriminations, and violence. Once, during a visit by Lucy at the prison, defendant struck her because he saw her talking with other men. In April 1985, defendant was released on parole and went to live with Lucy in an apartment in East Orange. After his release, they became embroiled in an argument at the home of one of Lucy's daughters. Again defendant struck Lucy. She started to call the police, but when defendant pointed a knife at her and challenged her to "call the cops," she did not complete the call. On yet another occasion, Migdalia Rodriguez, one of Lucy's daughters, reported to law-enforcement authorities that defendant was staying in Lucy's apartment with Migdalia's sisters and defendant's daughters, a condition that violated a term of his parole. This violation led to the revocation of defendant's parole and his return to prison for several months.

At the time of the homicide, defendant was employed as a security guard at a Woolworth store in Newark. Together with Anthony Baptiste, the cashier-supervisor at the store, Anthony's girlfriend, Maribel Santos, and Michael Harrison, another security guard, defendant went to the Erazo apartment to celebrate Harrison's birthday. On the way, they purchased a six-pack of beer, four wine coolers, and a pint of rum. During the course of the evening, Harrison and another guest, Blanca Flores, who also lived in the apartment complex, purchased a second bottle of rum. Throughout the evening both Samuel and Lucy consumed alcoholic beverages. A test of Lucy's blood taken during her autopsy yielded a blood alcohol reading of .195 percent.

Tension started to build as soon as defendant arrived at the apartment. When he tried to introduce Lucy to the guests, she refused to leave the kitchen until after dinner. Defendant became further disturbed when he discovered that the stereo was not working because Lucy had disconnected it while rearranging furniture that day. After dinner, Lucy and Blanca joined the party, and the group sat, talked, and listened to the stereo, which defendant and Blanca had fixed. Blanca showed Harrison how to dance the merengue, and the couples changed partners. At one point defendant told Harrison that "my wife is making me mad," and "she is going to make me do something I don't want to do." Defendant recounted to Harrison that on the previous day Lucy had angered him when he brought her flowers, which she threw in the trash can.

When the party broke up around 11:30 p.m., defendant asked Blanca to drive his friends home. The victim, however, interrupted and told defendant, "no, they're your friends, you take them home." Blanca, however, agreed to drive them home. Embarrassed and angry, defendant accompanied Blanca on the drive. On their return home, defendant and Blanca met the victim, who was drunk and disconsolate, as she left the apartment house. Blanca unsuccessfully tried to persuade Lucy to return to the apartment.

At this point the parties' versions differ. The State contends that Blanca told defendant to follow his wife. According to the State, after threatening that if he went after Lucy, he "might have to kill again," defendant in fact brought her back to the apartment. Defendant denies that he followed Lucy and asserts that she returned voluntarily. Both parties agree that Lucy returned to the apartment sometime after midnight.

According to Blanca's sister-in-law, Anna, who also lived in the apartment house, after defendant and Lucy had returned to their apartment, Anna heard the sound of glass breaking and Lucy screaming "God help me. He is killing me." Defendant then changed his clothes and within minutes of Lucy's return

left the apartment house. Standing beneath the window of Blanca's apartment, he told her to call an ambulance.

At trial, the State theorized that defendant's motive in killing the victim was that she had purposely cut her hand during her walk and then threatened to call the police, with the intention of telling them that defendant had inflicted the wound. This, so the State would again revoke defendant's parole and return him to prison. In a telephone conversation with the victim's daughter on the morning after the slaying, defendant related that when the victim had threatened him, he had "lost his head" and stabbed her. To the extent that the State relied on the victim's threat to call the police, its theory coincided with that of defendant, who contended that her threat enraged him and that he killed her in the heat of passion.

When emergency medical service and police personnel arrived, they found the victim lying on the floor. Next to her body was a blood-stained knife blade with a broken tip; the handle was on the vestibule floor. The apartment was in disarray, with glasses, a rum bottle, and a box of cassettes knocked to the floor. An autopsy revealed that the victim had sustained four knife wounds to her hands, arms, and chest; three slashes to the neck; and a single stab wound to the back that, according to the medical examiner, killed her instantly.

After leaving the apartment, defendant went to his mother's home in Jersey City, where he told his brother, an unemployed police officer, that he had stabbed the victim. Later that day, defendant surrendered to the police.

During the guilt phase of the trial, the defense centered on the contentions that defendant had been intoxicated, that the victim had provoked him, and that he was therefore guilty only of manslaughter. The jury, however, convicted defendant of knowing or purposeful murder.

In the penalty phase, the jury found two aggravating factors: that defendant had previously been convicted of murder, *N.J.S.A.* 2C:11–3c(4)(a); and that the murder was outrageously

or wantonly vile, horrible, or inhuman, *N.J.S.A.* 2C:11–3c(4)(c). The jury also found four mitigating factors: that defendant had been under the influence of an extreme mental disturbance, *N.J.S.A.* 2C:11–3c(5)(a); that the victim had participated in the conduct resulting in her death, *N.J.S.A.* 2C:11–3c(5)(b); that defendant had been intoxicated, *N.J.S.A.* 2C:11–3c(5)(d); and that defendant had been under unusual or substantial duress, *N.J.S.A.* 2C:11–3c(5)(e). On the jury's finding that the aggravating factors outweighed the mitigating factors, the court sentenced defendant to death.

–II–

A. *Jury Charge on Passion/Provocation Manslaughter*

■ We begin with the jury charge that impermissibly shifted to defendant the burden of proving passion/provocation. As the United States Supreme Court has held, the State must prove beyond a reasonable doubt all elements of a crime. *In re Winship*, 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368 (1970). A requirement that defendant prove adequate provocation beyond a reasonable doubt violates that rule. *See Mullaney v. Wilbur*, 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975) (holding that prosecution must disprove adequate provocation beyond a reasonable doubt when the issue is raised in a homicide case). When a defendant places passion/provocation in issue, the State, to prove a knowing or purposeful murder, must prove beyond a reasonable doubt that defendant's actions were not the result of passion. *Grunow, supra*, 102 *N.J.* at 145, 506 *A.*2d 708; *State v. Powell*, 84 *N.J.* 305, 315, 419 *A.*2d 406 (1980).

■ At the conclusion of the trial, defense counsel requested an instruction that the State bore the burden of disproving passion/provocation. Without objection from the State, the trial court rejected the request. Instead, after explaining the elements of passion/provocation manslaughter, the court instructed:

So if you're satisfied beyond a reasonable doubt that the defendant caused the decedent's death under circumstances that would [otherwise] be murder but was committed in the heat of passion, then you may return a verdict of guilty of manslaughter.

A fair reading leads to the conclusion that the charge erroneously placed on defendant the burden of proving passion/provocation. This error requires reversal. *Grunow, supra,* 102 *N.J.* at 148–49, 506 *A.*2d 708.

Although the State acknowledges that the quoted portion of the charge was erroneous, it contends that taken as a whole, the charge was at worst ambiguous. The State's argument continues that the proper standard for appellate review is whether there is a "reasonable likelihood that the jury * * * applied the challenged instruction" in an unconstitutional fashion. *Boyde v. California,* 494 *U.S.* 370, 380, 110 *S.Ct.* 1190, 1198, 108 *L.Ed.*2d 316, 329, *reh'g denied,* 495 *U.S.* 924, 110 *S.Ct.* 1961, 109 *L.Ed.*2d 322 (1990) (enunciating test for adequacy of ambiguous jury instructions). To support its contention that the charge was merely ambiguous, the State points to an earlier instruction:

[T]he burden of proof is on the State. * * * [T]hat burden never shifts and it remains on the State throughout the whole case, so no burden with respect to proof is imposed upon the defendant, Mr. Erazo. He is not obligated to prove his innocence.

That general statement, although accurate, lacks the muscle to shift to the State the burden to disprove passion/provocation. At best, the charge was contradictory. As we have previously stated, " '[c]ontradictory and inconsistent charges are inherently inadequate as they "create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner." ' " *State v. Moore,* 122 *N.J.* 420, 433, 585 *A.*2d 864 (1991) (*S. Moore* ) (quoting *Humanik v. Beyer,* 871 *F.*2d 432, 442 (3d Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989) (quoting *Francis v. Franklin,* 471 *U.S.* 307, 323 n. 8, 105 *S.Ct.* 1965, 1975 n. 8, 85 *L.Ed.*2d 344, 359 n. 8 (1985))). In brief, the charge was fatally flawed.

■ On appeal, the State also contends that the erroneous instruction was harmless because the evidence was insufficient to support a charge of passion/provocation manslaughter. In particular, the State argues that the evidence did not provide a rational basis for a jury to conclude that there had been adequate provocation. See *N.J.S.A.* 2C:1–8e (prescribing the "rational basis" test for an instruction on a lesser-included offense). Again, we disagree.

Our review of the record persuades us that the evidence of provocation was sufficient to support the charge on passion/provocation manslaughter. At trial, both the court and the State reached the same conclusion. As both the prosecutor and the court recognized, Erazo's defense was that he had committed manslaughter, not murder. At defendant's request, and without objection from the State, the trial court included a manslaughter instruction in the charge.

A court should grant a request for a charge on a lesser-included offense of manslaughter if the record provides a "rational basis" for a manslaughter conviction. *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 276, 508 *A.*2d 167 (1986). Although a "rational basis" requires more than a mere "scintilla of evidence," it is "[n]evertheless * * * a low threshold." *Id.* at 278, 508 *A.*2d 167; *see also State v. Coyle*, 119 *N.J.* 194, 224, 574 *A.*2d 951 (1990) (applying the "low threshold" test). In effect, the question is whether there is room for dispute whether the jury could find defendant guilty of manslaughter. *State v. Mauricio*, 117 *N.J.* 402, 415, 568 *A.*2d 879 (1990).

The Penal Code defines passion/provocation manslaughter as "[a] homicide * * * [that] is committed in the heat of passion resulting from a reasonable provocation." *N.J.S.A.* 2C:11–4b(2). Passion/provocation manslaughter has four elements: (1) adequate provocation of the defendant; (2) inadequate time for the defendant to "cool off"; (3) provocation of the defendant to a state of passion; and (4) the failure of defendant to "cool off." *Mauricio, supra,* 117 *N.J.* at 411, 568 *A.*2d 879.

Here, the focus is on the first element, adequate provocation. As we have cautioned, an abstract definition is only a guide in defining the parameters of passion/provocation manslaughter. *Crisantos (Arriagas), supra,* 102 *N.J.* at 275, 508 *A.*2d 167. Also, "[t]he specific evidence in each case must be carefully evaluated in the context of the entire record to determine whether passion/provocation manslaughter may properly be considered by the jury." *Ibid.*

The record demonstrates the tension between defendant and the victim on the night of the slaying. That tension was not an isolated occurrence, but a continuing strain in a marriage fraught with violence. The stress began the preceding evening when the victim rejected the flowers defendant had brought her. On the night of the homicide, the couple continued to feud. Defendant chastised the victim for rearranging the furniture and disconnecting the stereo. She refused to join his guests in the living room and remained in the kitchen with her friend Blanca until after dinner. Both defendant and the victim consumed alcoholic beverages that evening. Objective evidence establishes that she was intoxicated. The defense emphasized, moreover, that the partner-switching while dancing the merengue may have fueled their mutual feelings of jealousy and suspicion. At one point defendant told Harrison that the victim "was making him mad." After Blanca returned from taking the guests home, the victim drunkenly swung her pocketbook at Blanca, began to cry, and accused Blanca of "trying to go after my husband."

According to statements made by defendant after the homicide, the victim returned from her walk having deliberately cut her hand. He claims that he became enraged and attacked her when she told him she intended to have his parole revoked by telling the police that he cut her. His version is consistent with the fact that the victim previously had threatened to report defendant to the authorities. Moreover, defendant's parole had previously been revoked because of an "anonymous" report from one of the victim's children that defendant was violating

his parole. Thus, defendant argues that he was infuriated by the victim's threat to fabricate facts to cause the revocation of his parole. In this regard, we note that on the penalty phase the jury found that the victim had participated in the conduct that resulted in her death. That finding, as defendant argues, is consistent with the proposition that the victim's conduct and death are causally connected.

As is now well settled, the purpose of our review is not to determine whether the jury would have accepted defendant's explanation, *Mauricio, supra,* 117 *N.J.* at 415, 568 *A.*2d 879, but whether the evidence provided a "rational basis" for a passion/provocation charge, *N.J.S.A.* 2C:1–8e. We so find. See *Coyle, supra,* 119 *N.J.* at 224, 574 *A.*2d 951 (evidence of a confrontation between defendant, his lover, and the victim sufficient to support manslaughter charge).

██ The error in the manslaughter charge was aggravated by the court's instruction that the jury should first consider whether defendant was guilty of murder and that if it acquitted defendant of that offense, it should then consider the manslaughter charge. As we recently noted, a sequential charge can confuse jurors in a murder case when the court also charges on manslaughter. *See id.* at 222–24, 574 *A.*2d 951.

██ This part of the charge contained two errors. First, the instruction had the capacity to confuse the jurors about the elements of knowing or purposeful murder. As explained above, when a defendant places passion/provocation in issue, the State, to prove a knowing or purposeful murder, must prove beyond a reasonable doubt that the defendant did not act from passion aroused by reasonable provocation. Hence, the initial problem with the charge is that it may have foreclosed the jury from considering passion/provocation during its deliberations on the murder count. Second, the court erroneously instructed the jury that it could find passion/provocation manslaughter only if it first acquitted defendant of knowing or purposeful murder. This instruction is backwards. Only a

homicide that would otherwise be a knowing or purposeful murder may be reduced to manslaughter by the presence of passion/provocation. If, on retrial, the court should again give a sequential charge, it should make clear both that the absence of passion/provocation is an element of murder on which the State bears the burden of proof and that the jury may convict defendant only of manslaughter when the homicide would have been murder but for the existence of passion/provocation.

B. *Jury Charge on Knowing or Purposeful Murder*

■ Defendant argues as a matter of plain error that neither the jury instructions nor the verdict form distinguished between knowingly or purposely causing death and knowingly or purposely causing serious bodily injury that results in death. See *Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792. We agree. In *Gerald,* we held that the death penalty may be imposed only if the jury finds that the defendant knowingly or purposely caused death as distinguished from knowingly or purposely causing "serious bodily injury resulting in death." *Id.* at 69, 549 *A.*2d 792. This rule has required reversal of several pre-*Gerald* convictions when the charge did not distinguish between capital murder and serious bodily injury murder. See *State v. Dixon,* 125 *N.J.* 223, 251–55, 593 *A.*2d 266, 279–81 (1991); *S. Moore, supra,* 122 *N.J.* at 484–86, 585 *A.*2d 864; *State v. Harvey,* 121 *N.J.* 407, 412–14, 581 *A.*2d 483 (1990), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991); *State v. Clausell,* 121 *N.J.* 298, 312–16, 580 *A.*2d 221 (1990); *State v. Pennington,* 119 *N.J.* 547, 560–65, 575 *A.*2d 816 (1990); *State v. Long,* 119 *N.J.* 439, 460–65, 575 *A.*2d 435 (1990); *Coyle, supra,* 119 *N.J.* at 208–12, 574 *A.*2d 951; *Gerald, supra,* 113 *N.J.* at 69–70, 549 *A.*2d 792.

At trial, the court charged the jury:

Now, the charge contained in the indictment against Mr. Erazo is that he did murder one Lucy Erazo. Murder is the unlawful killing of one person by another purposely or knowingly. A person who commits a killing does so

purposely when it is his conscious object to cause death or serious bodily injury resulting in death.

A person who commits a killing does so knowingly when he is aware that what he is doing will cause death or serious bodily injury resulting in death. In either case, that is, whether the killing is committed purposely or knowingly caused the death or serious bodily injury, must be within the design or contemplation of the defendant.

The State concedes that the charge violates *Gerald*, but argues that the error was harmless. In its view, the evidence provides no rational basis for a jury to conclude that defendant intended to cause only serious bodily injury. As is so often the case when a defendant's mental state is at issue, the evidence points in more than one direction. Adequate evidence supports the State's contention that defendant intended to kill the victim. On the night of the homicide, defendant made statements to the effect that he "might have to kill" the victim. He cut her several times on her arms and neck and stabbed her once in the back. A bloody knife blade broken at both the tip and handle was found near the body, suggesting that defendant stabbed the victim with such ferocity and frequency to indicate an intent to kill.

Other evidence, however, points toward the conclusion that defendant killed neither purposely nor intentionally, but intending to cause only serious bodily injury. Within minutes after the stabbing, defendant asked Blanca Flores to call an ambulance. When he fled to his mother's apartment, he related the stabbing to his brother, who tried to summon help for Lucy. Several hours later, when defendant called the victim's daughters, he asked them how their mother was. In his conversation with one of the victim's daughters, defendant indicated that he had "lost his head" and attacked the victim after she had threatened to lie to the police to cause his parole to be revoked.

Further, a letter to Blanca, written by defendant after his arrest, explains that after Lucy had threatened to force his return to prison, he panicked. In that letter, which was admitted on the State's case, defendant wrote:

I couldn't react logically. My mind went blank: I only saw the time I was going to serve unfairly, without having done anything. When I came to and realized, she was [sprawled] on the floor and I had a knife in my hand, which I quickly let go of. * * * I didn't know whether she was dead or alive, although she appeared to be alive, because I felt like her breathing; that's when I told her that I was going to call the ambulance for her and I begged her not to die.

To some extent, the facts of this case are reminiscent of those in *S. Moore, supra*, 122 *N.J.* 420, 585 *A.*2d 864, in which we also reversed on *Gerald* grounds. Like the present case, *S. Moore* involved a killing in the context of jealousy and a deteriorating marriage. The defendant in *S. Moore* became involved in a confrontation with his wife after announcing his intention of leaving her for another woman. When the argument turned violent, the defendant struck his wife more than twenty times on the head with a hammer, killing her. On those facts, we held that it was for the jury "to consider a defense * * * that [defendant] did not intend to kill his wife, but lost control of himself and struck her, causing her to die, without intending her death." *Id.* at 485–86, 585 *A.*2d 864. Here, although defendant slashed the victim several times, he inflicted only a single fatal wound. He then sought medical assistance for the victim. We conclude that minimally adequate evidence exists to provide a rational basis for the jury to conclude that defendant intended to cause only serious bodily injury that resulted in death. Hence, we find that the charge constitutes plain error under *State v. Gerald.*

–III–

Because we reverse defendant's conviction and sentence for the reasons in Part II, we limit our remaining discussion to those issues on which further guidance might be helpful on retrial.

A. *Voir Dire*

Since the trial, we have rendered several decisions explaining that *voir dire* in a capital cause should be open-ended, *State v. Williams,* 113 *N.J.* 393, 413, 550 *A.*2d 1172 (1988) (*Williams* II);

thorough and searching, *State v. Biegenwald,* 126 *N.J.* 1, 32–35, 594 *A.*2d 172, 188–89 (1991) (*Biegenwald* IV); *Dixon, supra,* 125 *N.J.* at 246, 593 *A.*2d at 277; *State v. Marshall,* 123 *N.J.* 1, 90–94, 586 *A.*2d 85 (1991); *S. Moore, supra,* 122 *N.J.* at 451–54, 585 *A.*2d 864; *Williams* II, *supra,* 113 *N.J.* at 413, 550 *A.*2d 1172; *State v. Biegenwald,* 106 *N.J.* 13, 29–30, 524 *A.*2d 130 (1987) (*Biegenwald* II); sensitive to attorney participation, *Biegenwald* II, *supra,* 106 *N.J.* at 30, 524 *A.*2d 130; and designed to elicit a "potential juror's views, biases, and inclinations," *Biegenwald* IV, *supra,* 126 *N.J.* at 39, 594 *A.*2d at 192.

Without the benefit of those opinions, the trial court took a more constricted approach to the *voir dire.* Because we reverse on other grounds, we need not belabor this point. On remand, we trust the court will be guided by the intervening decisions.

Suffice it to state that *voir dire* in a capital cause should probe the minds of the prospective jurors to ascertain whether they hold biases that would interfere with their ability to decide the case fairly and impartially. An appropriate subject for such an inquiry is a juror's attitude about a defendant's prior murder conviction. *Biegenwald* IV, *supra,* 126 *N.J.* at 34–35, 594 *A.*2d at 189; *cf. Williams* II, *supra,* 113 *N.J.* at 413–17, 550 *A.*2d 1172 (error to refuse to ask jurors whether fact that defendant had raped victim in course of murder would unduly influence juror's decision to impose death penalty). Also, a court should avoid any artificial time limits on questioning by counsel. Here, the court imposed a "three minute rule," which limited counsel's questioning to three minutes. The record reflects that this limitation led to questioning that often was rushed and superficial. As long as counsel acts reasonably and responsibly, as counsel did here, *voir dire* should proceed uninhibited by any such artificial constraints.

B. *Evidence Issues*

 1. *Prejudice to Guilt Phase from Admission of Prior-Murder Evidence*

■ Defendant challenges the admission during the guilt phase of evidence that he had previously been convicted of murder for the 1977 stabbing death of Gladys Colon. During the guilt phase, Michael Harrison and Blanca Flores testified that on the night of the subject murder, defendant stated that he had killed before and that Lucy's behavior might cause him to kill again. Defendant argues that their testimony should have been excluded because the prejudicial effect outweighed its probative value. We find, however, that the trial court did not abuse its discretion in allowing the testimony.

Harrison testified that on the night of the killing defendant had confided that he had served a prison term for killing someone and that "Lucy is going to make me do something I don't want to do." Blanca Flores testified that when Lucy left the apartment to go for a walk after the party, defendant rejected Blanca's suggestion that he follow Lucy, stating that "I killed before and if I go after her I'll kill again."

At pre-trial proceedings, the court ruled admissible the testimony of both witnesses about defendant's prior crimes. Originally the State sought admission to prove both a signature crime and defendant's mental state. At trial, the State introduced the evidence solely to establish defendant's state of mind.

In addition to the testimony of those witnesses, the court also admitted redacted records of defendant's convictions for the prior murder and for carnal abuse of Gladys Colon. The nature of the offenses was redacted, so the records revealed only that defendant had been convicted of two indictable offenses and that he had been sentenced to prison for a term of twenty to thirty years on one offense and to a concurrent ten to fifteen years on the other offense. The State sought admission of the records to prove that defendant was on parole, thereby corrobo-

rating the State's theory that Lucy had threatened to report him for a parole violation.

Appellate courts generally defer to trial court rulings on the admissibility of evidence of other crimes, unless those rulings constitute an abuse of discretion. *State v. Ramseur*, 106 *N.J.* 123, 265–66, 524 *A.*2d 188 (1987); *State v. Atkins*, 78 *N.J.* 454, 462, 396 *A.*2d 1122 (1979). We find no such abuse here.

Defendant's statements evidence his state of mind at the time he killed Lucy. The statements, which were made shortly before he killed her, referred to a prior murder. They were relevant to whether defendant had killed Lucy purposely or knowingly, or whether he had been provoked and had killed her in the heat of passion. Thus, defendant's statements related to the crucial issue of his mental state. The records of defendant's convictions arising out of the killing of Gladys Colon were necessary to prove the State's theory of defendant's motive. The State's theory was that defendant killed Lucy because she had threatened to cause revocation of his parole from his sentence for those convictions.

2. *Prejudice to Penalty Phase from Guilt–Phase Evidence*

Defendant argues as plain error that evidence presented during the guilt phase prejudiced the penalty-phase proceedings. At issue are records of defendant's prior conviction for carnal abuse of Gladys Colon, the previously-mentioned statements by defendant that he had killed before and might have to kill again, and three 8" × 10" color photographs of the autopsy. The photographs were admitted to prove the manner and cause of death. One photograph showed the cuts to the victim's left hand, and a second showed the fatal stab wound to the victim's back. The last photograph not only showed the slash wounds to the victim's chest and neck, but also depicted the icy stare frozen on the victim's face. As previously discussed, the records of defendant's prior conviction for carnal abuse were admitted to prove that defendant was on parole at the time of

the killing. His statements that he might have to kill again were admitted to prove his intent. Without objection from defendant, all of that evidence was incorporated by reference at the penalty phase. At no time during the penalty phase did the trial court issue a limiting instruction concerning the use of the evidence.

Both photographs and other-crimes evidence have the capacity to prejudice penalty-phase proceedings in capital murder cases. *See S. Moore, supra,* 122 *N.J.* at 469, 585 *A.*2d 864 (noting capacity of prejudicial photos to taint the penalty phase); *State v. Pitts,* 116 *N.J.* 580, 638–39, 562 *A.*2d 1320 (1989) (the need to weigh the prejudicial value of photographs "is especially critical in the penalty phase of a capital case"); *State v. Moore,* 113 *N.J.* 239, 276–77, 550 *A.*2d 117 (1988) (*M. Moore* ) (prejudice from other-crimes evidence may warrant severance of an indictment); *State v. Rose,* 112 *N.J.* 454, 533–36, 548 *A.*2d 1058 (1988) (*Rose* I) (error to have admitted autopsy photo). When the same jury hears both phases of such a case, evidence admitted on the guilt phase may sometimes taint the penalty phase. *See, e.g., Dixon, supra,* 125 *N.J.* at 249–50, 593 *A.*2d at 279 (movie shown during guilt phase so prejudicial as to require vacation of death sentence). With the stakes so high, the possibility of prejudice on the penalty phase persists as a cause for continuing concern.

On this record, we do not find that the trial court committed plain error on the guilt phase by admitting the other-crimes evidence and the autopsy photographs. That conclusion, however, does not foreclose defendant from challenging admission of those items on remand. If the State again seeks the death penalty, the court can minimize prejudice by empaneling separate juries to hear the guilt and penalty phases of the trial. *N.J.S.A.* 2C:11–3c(1); see *M. Moore, supra,* 113 *N.J.* at 277, 550 *A.*2d 117 (recommending the use of separate juries to avoid prejudice to defendant from other-crimes evidence); *cf. Biegenwald* IV, *supra,* 126 *N.J.* at 43–44, 594 *A.*2d at 194 (separate juries likely will be required when State relies on aggravating

factor c(4)(a)). A separate penalty-phase jury commends itself when guilt-phase evidence is so prejudicial that the same jury could not fairly sit on both phases of the trial. *See State v. Monturi,* 195 *N.J.Super.* 317, 478 *A.*2d 1266 (Law Div.1984) (considering a pre-trial motion for separate juries). A separate jury would obviate death qualification of the guilt-phase jury and would permit admission of evidence at the guilt phase without regard to the carry-over prejudicial effect on the penalty phase. *See, e.g., State v. Hunt,* 115 *N.J.* 330, 396–99, 558 *A.*2d 1259 (1989) (Handler, J., dissenting) (discussing the use of two juries throughout the trial); *Monturi, supra,* 195 *N.J.Super.* 317, 478 *A.*2d 1266 (discussing the need for separate juries when other-crimes evidence is admitted on guilt phase).

 When the same jury hears both phases of the trial, the court should provide instructions on the extent to which the jury may use guilt-phase evidence on its penalty-phase deliberations. Even when guilt-phase evidence is not incorporated in the penalty phase, the danger abides that the jury will rely on it during the penalty-phase deliberations. *See Rose* I, *supra,* 112 *N.J.* at 505–08, 548 *A.*2d 1058 (vacating defendant's death sentence because of danger that jury considered irrelevant other-crimes evidence). Thus, the court should instruct the jury concerning the evidence that it may use in its penalty deliberations and the purposes for which that evidence may be used.

3. *The Constitutionality and Scope of N.J.S.A. 2C:11–3c(2)(f)*

 Defendant argues as plain error that *N.J.S.A.* 2C:11–3c(2)(f) (c(2)(f)) denied him a fair trial because it subjected him to punishment for the prior murder of Gladys Colon. During the penalty phase, the State adduced evidence in support of aggravating factor *N.J.S.A.* 2C:11–3c(4)(a) (c(4)(a)) that defendant had previously been convicted of murder. Section c(2)(f) provides in relevant part: "Evidence offered by the State with regard to the establishment of * * * [aggravating factor

c(4)(a) ] may include the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant." That section describes the evidence that may be included when proving a prior murder under c(4)(a). Defendant contends that c(2)(f) violates his constitutional protection against double jeopardy and is an *ex post facto* law under both the United States and New Jersey Constitutions. *U.S. Const.* amend. V; *N.J. Const.* art. 1, para. 11 (double jeopardy); *U.S. Const.* art. 1, § 10, cl. 1; *N.J. Const.* art. 4, § 7, para. 3 (*ex post facto* ). The argument lacks merit.

Pursuant to c(2)(f), the State sought to present various evidence about defendant's prior murder conviction. The State proffered the official record of the conviction, testimony of a police officer that defendant had confessed to murdering Colon, the autopsy report that described in detail the manner and cause of Colon's death, and the autopsy photographs of Colon's mutilated corpse.

After considering the prejudicial effect of the evidence, the trial court disallowed introduction of the photographs and portions of the autopsy report, but allowed introduction of evidence of the conviction, a stipulated version of the autopsy report, and the testimony of the officer that defendant had confessed to murdering Colon. Although the trial court instructed the jury generally about weighing aggravating and mitigating factors, it did not issue any instructions about the limited purposes for which the prior-murder evidence could be used.

We reject both of defendant's constitutional challenges to c(2)(f). That statutory provision neither constitutes an *ex post facto* law nor violates the prohibition against double jeopardy. Evidence of a prior murder is admissible under c(2)(f) not for the purpose of punishing defendant for that murder, but to enable the jury to determine the appropriate sentence for the present murder. As the State argues, c(2)(f) does not under-

take to punish for the prior offense, but rather to enhance punishment for the subsequent murder offense.

Generally, sentence enhancement based on the defendant's prior record does not violate either the federal or the New Jersey constitutions. *See, e.g., McDonald v. Massachusetts,* 180 *U.S.* 311, 21 *S.Ct.* 389, 45 *L.Ed.* 542 (1901) (rejecting, *inter alia,* both a double-jeopardy and an *ex post facto* law challenge to a Massachusetts sentence-enhancement provision); *Moore v. Missouri,* 159 *U.S.* 673, 16 *S.Ct.* 179, 40 *L.Ed.* 301 (1895) (rejecting, *inter alia,* a double-jeopardy challenge to a Missouri sentence-enhancement provision); *In re Caruso,* 10 *N.J.* 184, 89 *A.*2d 661 (1952) (rejecting, *inter alia,* an *ex post facto* law challenge to a New Jersey sentence-enhancement provision). Although we have not previously considered the issue, courts of other states have upheld the introduction of prior-crimes evidence at capital-sentencing proceedings. *See, e.g., Stano v. State,* 473 *So.*2d 1282 (Fla.1985), *cert. denied,* 474 *U.S.* 1093, 106 *S.Ct.* 869, 88 *L.Ed.*2d 907 (1986); *State v. McDowell,* 310 *N.C.* 61, 310 *S.E.*2d 301 (1984).

▮▮▮ As we have previously noted, the need to guard against "jury prejudice" is critical in the penalty phase of a capital case. *See Pitts, supra,* 116 *N.J.* at 538–39, 562 *A.*2d 1320 (discussing prejudice from autopsy photographs). Evidence of other crimes is of special concern because of its capacity to prejudice capital-sentencing deliberations. *See, e.g., Pennington, supra,* 119 *N.J.* at 585–87, 575 *A.*2d 816 (recognizing potential prejudice in capital case from admission of prior murder conviction); *State v. Stevens,* 115 *N.J.* 289, 302, 558 *A.*2d 833 (1989) (noting the "widespread agreement that other-crimes evidence has a unique tendency to turn a jury against the defendant"); *Rose I, supra,* 112 *N.J.* at 505–08, 548 *A.*2d 1058. Because of that capacity, the trial court should instruct the jury about the limited use of evidence relating to defendant's prior murder conviction. *Evid.R.* 6; *see M. Moore, supra,* 113 *N.J.* at 276–77, 550 *A.*2d 117 (requiring limiting instruction on prior-crimes evidence);

*Rose* I, *supra,* 112 *N.J.* at 505–08, 548 *A.*2d 1058 (requiring limiting instruction on prior bad-conduct evidence). Such an instruction should make clear that defendant has already been punished for the prior conviction and that the jury should consider the conviction only in determining whether the death penalty should be imposed for the present murder, not the earlier one.

█ Defendant also challenges as plain error the admission of the stipulated autopsy report to prove the "manner of death" in the murder of Gladys Colon. With the agreement of both parties, the trial court admitted in evidence three pages from that report. The selected pages described not only the multiple stab wounds as the cause of death, but also the details of each wound. They also contained a diagram showing the location of the wounds. Contending that its prejudicial effect outweighed its probative value, defendant now argues that the autopsy report should not have been admitted to prove the "manner of death" under c(2)(f). Although we do not find the admission of the stipulated report to constitute plain error, on remand defendant should not be bound by the stipulation.

█ The history of c(2)(f) reflects the Legislature's concern about the amount of evidence of prior murders that is admissible on the penalty phase. The Judiciary Committee's statement explains that the purpose of c(2)(f) is "to avoid turning the sentencing proceeding into a second trial of the previous case and at the same time to provide the jury with some information about the prior conviction." Senate Judiciary Committee Statement to Senate No. 950, at 2. We believe that the statutory purpose can be served with less than the stipulated evidence. The prejudicial effect of a graphic and detailed account of the victim's death might exceed its probative value. On remand, the purposes of the statute will be served if the evidence of the manner of Colon's death is described as multiple stab wounds to the chest, lungs, and heart.

## C. *Section c(4)(c) Factor*

■ Finally, we agree with defendant that the evidence was insufficient to submit aggravating factor c(4)(c) to the jury. As we have previously explained, that factor primarily concerns the defendant's mental state at the time of the killing. *State v. Oglesby,* 122 *N.J.* 522, 533, 585 *A.*2d 916 (1991); *Ramseur, supra,* 106 *N.J.* at 197–211, 524 *A.*2d 188. Two alternatives support a finding of the existence of aggravating factor c(4)(c). The first is "torture": whether "defendant intended to, and did in fact, cause extreme physical or mental suffering—in addition to death." *Ramseur, supra,* 106 *N.J.* at 208, 524 *A.*2d 188. The second is "depravity of mind": whether defendant killed "for no purpose * * * beyond his pleasure of killing." *Id.* at 211, 524 *A.*2d 188. At no time has the State argued that the killing was depraved.

Consequently, we limit our analysis to "torture," evidence of which may be inferred from the circumstances of the case. *State v. Matulewicz,* 115 *N.J.* 191, 194, 557 *A.*2d 1001 (1989); *Ramseur, supra,* 106 *N.J.* at 211 n. 28, 524 *A.*2d 188. One element of torture is intent. *Ramseur, supra,* 106 *N.J.* at 208, 524 *A.*2d 188. The Court has found the requisite intent in a number of cases. *See S. Moore, supra,* 122 *N.J.* at 474–78, 585 *A.*2d 864 (defendant repeatedly struck wife in head with hammer, and medical testimony suggested defendant intended her to suffer); *State v. McDougald,* 120 *N.J.* 523, 566–67, 577 *A.*2d 419 (1990) (defendant repeatedly slashed and bludgeoned his victims before killing them); *State v. Davis,* 116 *N.J.* 341, 376, 561 *A.*2d 1082 (1988) (defendant stabbed and mutilated victim's body with screwdriver and knife, in addition to killing her by strangulation with an electric cord); *Gerald, supra,* 113 *N.J.* at 66–67, 549 *A.*2d 792 (defendant beat victim and repeatedly stomped on his face); *State v. Zola,* 112 *N.J.* 384, 434, 548 *A.*2d 1022 (1988) (defendant tied up victim, beat her severely, and scalded her body such that sixty-percent of her body was missing skin), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989); *Ramseur, supra,* 106 *N.J.* at 286–88, 524

*A.*2d 188 (defendant repeatedly stabbed victim, left, returned to inflict more wounds, and said he would kill her grandchildren if he could find them). By contrast, on several occasions the Court has found the evidence insufficient to justify a charge that the defendant had intended the victim to endure pain and suffering during the commission of the murder. *See Matulewicz, supra,* 115 *N.J.* at 200, 557 *A.*2d 1001 (defendant struck baby on head, threw her into crib, then shook her to death); *Rose* I, *supra,* 112 *N.J.* 454, 527–33, 548 *A.*2d 1058 (defendant shot victim once in abdomen with shotgun); *Biegenwald* II, *supra,* 106 *N.J.* at 50, 524 *A.*2d 130 (defendant shot victim four times in head at close range).

■■■ On this record, we find that the evidence was insufficient for a rational jury to find torture in the statutory sense. See *McDougald, supra,* 120 *N.J.* at 566, 577 *A.*2d 419. Multiple stab wounds, when combined with evidence of intent to torture, might support a charge on c(4)(c). *Hunt, supra,* 115 *N.J.* at 389, 558 *A.*2d 1259. At most, the evidence here demonstrates a violent killing from a knife attack that lasted several minutes. The record does not suggest that defendant sought to prolong either the attack or the suffering of the victim. For example, the testimony of Blanca Flores indicates that no more than five minutes elapsed from the time that defendant entered the apartment, killed the victim, changed his clothes, and left. The victim's suffering by itself does not convert a homicide to capital murder. Even on the assumption that the attack was more than momentary, it is not enough that the victim's death was painful. Under the statute, "torture" does not exist merely because the victim endured horrible pain. *See Matulewicz, supra,* 115 *N.J.* at 200, 557 *A.*2d 1001 (baby died six days after defendant struck her on head, threw her into crib, and shook her severely); *Rose* I, *supra,* 112 *N.J.* at 527–33, 548 *A.*2d 1058 (defendant shot victim once in abdomen with shotgun, and victim died three hours later in surgery). To constitute torture, the defendant must have intended to inflict pain incremental to that attributable to the act of killing. Here, the record is

devoid of any such evidence. It bespeaks a killing that was violent and brutal, not one that was the product of torture. If so lethal an attack in so brief a period demonstrates "torture," then virtually any murder could be considered a capital offense. Whether the defendant would be subject to the death penalty would be determined not by the evidence, for any evidence would suffice, but by the whim of the prosecutor. We do not believe that the Legislature intended so freakish a result.

In sum, the State did not prove "torture" under c(4)(c). It follows that the State may not rely on that factor on remand. *See Biegenwald* II, *supra*, 106 *N.J.* at 51, 524 *A.*2d 130.

The judgment of conviction for murder is reversed, and the matter is remanded to the Law Division for re-trial.

GARIBALDI, J., concurring.

I agree with the majority's resolution of this case's two dispositive issues. The trial court's jury instruction on manslaughter impermissibly shifted to the defendant the burden of proving passion or provocation. *See State v. Grunow*, 102 *N.J.* 133, 506 *A.*2d 708 (1986). The trial court's instruction on murder failed to force the jury to distinguish between knowingly or purposely causing death and knowingly or purposely causing serious bodily injury resulting in death. *See State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988). Because the record would support a jury determination that passion or provocation was present or that Erazo only knowingly caused serious bodily injury that resulted in death, we cannot call those errors harmless. Defendant must be retried and resentenced.

I write separately to express my continuing reservations regarding the majority's implication that inquiring into "a [prospective] juror's attitude about a defendant's prior murder conviction" is an indispensible part of a constitutionally adequate *voir dire*. *Ante* at 129, 594 *A.*2d at 241 (citing *State v. Biegenwald*, 126 *N.J.* 1, 28–29, 594 *A.*2d 172, 186). Although such a question may be an "appropriate subject" for *voir dire*

inquiry, I would defer to the soundly exercised discretion of the trial judge in any given case. *See State v. Biegenwald*, 126 *N.J.* at 70, 594 *A.*2d at 208 (Garibaldi, J., dissenting). If mandated, such questions will "unravel much of the capital-sentencing jurisprudence we have painstakingly developed," *id.* at 94, 594 *A.*2d at 223 (Garibaldi, J., dissenting), by limiting the discretion of trial courts to conduct a *voir dire* appropriate to an individual case and " 'not chained to any * * * artificial formula.' " *Id.* at 66, 594 *A.*2d at 206 (quoting *United States v. Wood*, 299 *U.S.* 123, 145–46, 57 *S.Ct.* 177, 185, 81 *L.Ed.* 78, 88 (1936)).

Whether, and to what extent, to pursue any inquiry on *voir dire* is within "the wide discretion granted to the trial court." *Mu'Min v. Virginia*, — *U.S.* —, —, 111 *S.Ct.* 1899, 1906, 114 *L.Ed.*2d 493, 507 (1991); *see also State v. Hunt*, 115 *N.J.* 330, 357, 558 *A.*2d 1259 (1989) (leaving the conduct and content of *voir dire* to the "sound discretion" of trial courts). I agree with Justice Kennedy that "there is no single way to *voir dire* a juror, and I would not limit the trial judge's wide discretion to determine the appropriate form and content of *voir dire* questioning." *Mu'Min v. Virginia, supra*, — *U.S.* at —, 111 *S.Ct.* at 1919, 114 *L.Ed.*2d at 522 (Kennedy, J., dissenting) (noting that constitutionally-adequate *voir dire* of individual jurors can follow from either specific or general questions). Therefore, I would hesitate to embed any particular question as the *sine qua non* of a constitutionally-adequate *voir dire*.

I agree with the majority's decision to remand the case, and would leave the content and conduct of *voir dire* questioning to the sound discretion of the trial court.

HANDLER, J., concurring in part and dissenting in part.

Samuel Erazo was convicted of murder and sentenced to death. The Court now reverses both his conviction and death sentence. I concur in that judgment.

The Court rules that the trial court impermissibly shifted the burden to defendant to prove beyond a reasonable doubt that he acted in the heat of passion on reasonable provocation and that the error required a reversal of the conviction for knowing and purposeful murder. *Ante* at 121–126, 594 *A.*2d at 237–239. The Court also determines that there was a rational basis in the evidence to enable a reasonable jury to determine that defendant did not intend to kill his victim and that the trial court failed to charge the jury correctly under *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988). *Ante* at 126–129, 594 *A.*2d at 239– 240. I agree with each of these rulings.

There are additional grounds that, in my view, merit reversals of the murder conviction and death sentence. The *voir dire* was so inadequate as to deprive defendant of his constitutional right to a fair and impartial jury. Further, I am convinced that the use of evidence relating to a prior murder was error. Although the prior murder conviction itself was a permissible aggravating factor, under the circumstances it was error to introduce it into evidence in the guilt phase of the trial. Further, the details of the prior murder were inflammatory and went well beyond a legitimate probative purpose. In addition, there was insufficient evidence to support the c(4)(c) aggravating factor. Its presentation in the penalty trial had multiple prejudicial effects. It exacerbated the prejudicial impact of the evidence of the details of the prior murder. Further, in view of the patently insufficient evidence of c(4)(c), reliance on that factor constituted an abuse of prosecutorial discretion and prosecutorial overcharging. Finally, I believe that our State Constitution requires us to scrutinize victim-impact evidence more rigorously than does the United States Constitution as interpreted by recent Supreme Court precedent.

I also dissent from the Court's judgment remanding the matter to be retried as a capital case. I adhere to the view that the capital-punishment statute is unconstitutional, as enacted, construed, and applied. *E.g., State v. Dixon,* 125 *N.J.* 223, 265,

593 *A.*2d 266, 286 (1991) (Handler, J., dissenting in part and concurring in part).

I

Defendant contends that the *voir dire* violated his right under the state and federal constitutions to trial by an impartial jury. The court expresses misgivings about the *voir dire* but fails to determine that its deficiencies were sufficiently serious to warrant reversal. *Ante* at 128–130, 594 *A.*2d at 240–241.

Although the right of a defendant in a criminal trial to a fair and impartial jury is guaranteed under both the state and federal constitutions, it is a right of special importance under the New Jersey Constitution. "The courts in this State have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance." *State v. Williams* I, 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983); *cf. State v. Dunne*, 124 *N.J.* 303, 590 *A.*2d 1144 (1991) (if defendant is required to be tried by jury, court must assure thorough *voir dire* so that jury is fair and impartial). This Court has repeatedly stated that the juries in this State must be "as nearly impartial 'as the lot of humanity will admit.' " *State v. Williams*, 113 *N.J.* 393, 409, 550 *A.*2d 1172 (1988) (*Williams* II) (citations omitted). The requirement of jury impartiality "is heightened in cases in which the defendant faces death." *Ibid.* (quoting *Williams* I, 93 *N.J.* at 60, 459 *A.*2d 641); *see State v. Ramseur*, 106 *N.J.* 123, 324 n. 84, 524 *A.*2d 188 (1987).

In *Williams* II, this Court set forth the standard by which trial courts must conduct *voir dire* in capital cases. That standard requires open-ended, probing, and exhaustive questioning of prospective jurors to ensure that no bias or prejudice enters the jury's deliberations:

[C]ounsel must be afforded the opportunity for a thorough *voir dire* to evaluate and assess jurors' attitudes in order to effectively participate in jury selection. If counsel is unable to screen out prejudice and bias, that inevitably leads to

unfair juries. This result—or the possibility of this result—cannot be tolerated. [113 *N.J.* at 409, 550 *A.*2d 1172.]

The Court has continued to adhere to the standards of *Williams* II, and thus has found various aspects of the *voir dire* to be less than adequate in a number of subsequent capital cases. *E.g., State v. Biegenwald,* 126 *N.J.* 1, 594 *A.*2d 172 (1991) (*Biegenwald* IV); *State v. Moore,* 122 *N.J.* 420, 443–54, 585 *A.*2d 864 (1991); *State v. Clausell,* 121 *N.J.* 298, 320–32, 580 *A.*2d 221 (1990); *State v. Johnson,* 120 *N.J.* 263, 292–93, 576 *A.*2d 834 (1990). In *Biegenwald* IV, the Court set aside the defendant's capital sentence on the sole ground of inadequate *voir dire.*

In this case, the Court apparently finds the *voir dire* inadequate, *ante* at 128–130, 594 *A.*2d at 240–241 but, because it reverses defendant's conviction and sentence on other grounds, it chooses not to "belabor this point," *ante* at 129, 594 *A.*2d at 241. I believe it essential, however, to elaborate on the horrendous inadequacies of the *voir dire* in this case, and to explain why this *voir dire* by itself requires the reversal of defendant's conviction and capital sentence. It cannot, in this context, be overemphasized that the United States Supreme Court continues to eviscerate the procedural safeguards afforded capital defendants under the federal constitution, see, *e.g., Mu'Min v. Virginia,* — *U.S.* ——, 111 *S.Ct.* 1899, 114 *L.Ed.*2d 493 (1991) (where jurors admitted having been exposed to news accounts concerning the murder with which defendant had been charged, trial court's failure to ask the jurors about contents of the accounts did not deprive defendant of his sixth amendment right to impartial jury). That untoward development only strengthens the need and responsibility of state judiciaries to assure the sufficiency of protection in capital causes. *See* Acker & Walsh, "Challenging the Death Penalty Under State Constitutions," 42 *Vand.L.Rev.* 1299, 1345–54 (1989) (capital defendant's right to fair and impartial jury likely to be better protected under state constitutions than United States Supreme Court precedent). That is particularly true when, as here, the

right afforded under the State Constitution is broader than under the Federal Constitution, and where federal decisions betray indifference and inconsistency with respect to the rights of capital defendants. *See Williams* II, 113 *N.J.* at 465, 550 *A.*2d 1172 (Handler, J., concurring) (noting areas in which this Court has departed from federal death-penalty jurisprudence); *State v. Ramseur, supra,* 106 *N.J.* at 345–82, 524 *A.*2d 188 (Handler, J., dissenting) (to follow federal death-penalty precedent would be to risk integrity of our constitutional principles).

In this case, one critical issue on the *voir dire* concerned the relevance of defendant's prior murder conviction. At a pre-trial conference between court and counsel regarding the content of *voir dire,* defense counsel sought to have the court ask the following question of prospective jurors: "Would you favor the death penalty for someone who has previously been convicted of murder?" The court refused defendant's request, stating that "[w]hat you're now getting into is the aggravating, mitigating factors, and trying to probe a juror as to how they approach an aggravating factor, whether that aggravating factor is enough to carry the death [sic]." After the court later ruled that the State could introduce evidence of defendant's prior murder during the guilt phase pursuant to *Evidence Rule* 55, defendant renewed his request. The court again denied the request, stating: "well then I get into the position of if for some reason it [the prior murder] doesn't come out, that I have this all before the jury sitting there waiting for what information they're going to hear about it." The court repeated that in any case, it believed the question improper. The second day of *voir dire,* defendant again requested the court to question prospective jurors on their feelings about "this highly prejudicial" evidence. Again, the court denied the request.

In my view, the trial court's denial of the *voir dire* requested by defendant's trial counsel with respect to juror attitudes toward a defendant with a prior murder conviction deprived defendant of the opportunity to discover which of the prospec-

tive jurors harbored impermissible or undesirable biases, thereby denying defendant due process.

In *Williams* II, the defendant argued that the trial court had abused its discretion in failing to ask prospective jurors who favored the death penalty whether they would automatically favor death if the defendant had committed murder and rape. The Court stated that

the issue presented is not simply whether the combination of murder and another crime would prompt a juror to automatically support the death penalty in all cases, which obviously warrants disqualification. Rather, the issue is whether the juror's "capacity to credit the evidence in mitigation would be 'substantially impaired' within the meanings of *Adams* [*v. Texas*, 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980)] and [*Wainwright v. Witt*, 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985)]." [113 *N.J.* at 415, 550 *A.*2d 1172 (quoting *State v. Bey*, 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988) (*Bey* II)).]

This Court held that "[t]he trial court's refusal to allow questions that might provide important insight into any juror's attitude concerning a rape accompanying a murder constitutes serious error." *Id.*, 113 *N.J.* at 417, 550 *A.*2d 1172.

In *State v. Biegenwald* IV, *supra*, the Court, relying on *Williams* II, held that the trial court's failure to ask jurors whether they would favor the death penalty for someone previously convicted of murder also "constituted serious error." 126 *N.J.* at 30–35, 594 *A.*2d at 187–189. According to the Court,

[t]he similarities between this *voir dire* and the one addressed in *Williams* II are plentiful, obvious, and disturbing.

 \* \* \* \* \* \* \* \*

With the mere interchange of "another murder" for "rape," th[e] reasoning [of *Williams* II] is equally applicable to the present circumstances.

 \* \* \* \* \* \* \* \*

In *Williams* II, we recognized that the brutality of a rape and murder could blind venirepersons in the performance of their duties as jurors. Similarly, we are convinced that knowing a defendant had killed before could cause an otherwise fair-minded person to disregard evidence offered in support of mitigating factors. [126 *N.J.* at 30, 31, 32, 594 *A.*2d at 186–187.]

The Court found that that error, combined with an overall *voir dire* that was less than probing and thorough, required reversal

of the defendant's capital sentence. 126 *N.J.* at 35, 594 *A.*2d at 189.

In addition, the trial court here erred in failing to question prospective jurors on whether views in favor of the death penalty would prevent or substantially impair their performance as jurors. In *Bey* II, *supra*, 112 *N.J.* at 152, 548 *A.*2d 887, the Court stated:

> Jurors are equally bound to render a just and impartial verdict whether they are for or against the death penalty. Our duty to assure that a defendant is tried by an impartial jury leads us to conclude that a single test should apply to all jurors irrespective of their predilection concerning the death penalty.

This Court noted that the United States Supreme Court has "similarly concluded that it would be reversible error to permit jurors to sit on the penalty phase if their bias in favor of the death penalty substantially impaired their impartiality, provided the defense properly preserved the right to challenge the court's failure to remove the jurors for cause." *Ibid.* (citing *Ross v. Oklahoma,* 487 *U.S.* 81, 108 S.Ct. 2273, 101 *L.Ed.*2d 80 (1988)).

Defendant here requested that three questions concerning attitudes toward the death penalty be included in the questionnaire distributed to prospective jurors. The questions were:

> If you were convinced beyond a reasonable doubt that a defendant was guilty of knowing or purposeful murder, is there any reason you would not impose the death penalty?

> Are your feelings about the death penalty such that it would be difficult for you to consider a life sentence as an alternative punishment?

> Do you think that the death penalty is the appropriate punishment for all murders?

The trial court refused to allow any of the questions. The trial court's main concern was "not [to] allow [counsel] to probe into the reasoning of the jurors." The trial court explained its objection to the first of the three questions as follows:

> I think I have already asked this question and, too, *this is in effect asking the juror as to what their standards are or would be for imposing the death penalty and that we're not interested in.* [emphasis added).]

The court had made clear that it would not allow defense counsel to probe the venirepersons' views on the death penalty, and defense counsel was able to ask only limited questions.

THE COURT: We're not interested in their opinions on the death penalty. This is not a philosophy class.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

The purpose of our inquiry is could you enforce the law that's providing for the death penalty, not questioning them as to what factors bring that law into being or brings that particular provision of our law into force. We're not going to question them on that. I think that would be improper.

The court was apparently concerned that the defense in effect was challenging the legislative standard and attempting to gain some sort of strategic advantage. The court stated:

Well, what you're in effect asking, and that's one of the problems with these probing questions here, are your feelings about the death penalty such that it would be difficult for you to consider a lighter sentence as an alternative punishment.

If a person indicated in that question yes, then you would, I think, conclude that that person is a person strongly in favor of the death penalty because it would be difficult for them to consider anything else as an alternative punishment because it didn't equal the death penalty, and I think that's where that question ultimately leads when you sit down and analyze what the yes means.

If the person says no, then you would get the impression that they could impose a lesser sentence such as life imprisonment as an alternative and be more comfortable with that, and that would be the type of juror that you would seek. [ (Emphasis added).]

The very purpose of *voir dire*, especially in a capital case, is to probe the minds of jurors in order to make sure their biases will not interfere with the exercise of their duties. *See Williams* II, *supra*, 113 *N.J.* at 418–427, 550 *A.*2d 1172. Furthermore, "when exercising their wide discretion to control *voir dire* in death penalty cases . . ., trial courts should be sensitive to the questions suggested by counsel . . .," *Williams* II, *supra*, 113 *N.J.* at 426, 550 *A.*2d 1172, and "should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias." *Williams* I, *supra*, 93 *N.J.* at 68, 459 *A.*2d 641.

The court refused to permit the questions suggested by counsel, and without giving any satisfactory reasons, and re-

fused most of counsel's entreaties at least to have the court itself ask proposed similar questions. As a result, many prospective jurors, including jurors who were seated as part of the deliberating jury, were never asked if they would automatically vote for the death penalty. Virtually no prospective jurors were asked if there were any circumstances under which they would be more inclined to impose the death penalty. However, if a juror indicated a willingness to impose the death penalty, questioning on the subject ended there. By contrast, generally, if a juror indicated hesitancy in answering a question on his or her ability to impose the death penalty, extensive questioning followed. Furthermore, although the court excused for cause a number of jurors because of their feelings against the death penalty, not a single prospective juror was excused for cause as a result of his or her feelings in favor of the death penalty. The result, similar to *Williams* II, is that nothing of substance concerning the views of jurors favoring the death penalty is ascertainable from this record. See 113 *N.J.* at 423, 550 *A.*2d 1172.

Another serious defect of the *voir dire* was the three-minute limit the court imposed on counsel during their questioning of prospective jurors. It does not escape the Court's criticism. *Ante* at 129. Although allowing counsel to question prospective jurors, the court imposed a three-minute limit, explaining that "to say we're going to start off open-ended and see where it takes us, I have found that in my previous jury qualifications for this type of case *it utilizes too much time and we always hit a rhythm after we eliminated that open-ended.*" (Emphasis added). It is true that the court often allowed counsel to go over the limit, particularly when the venireperson had indicated a reluctance to impose the death penalty. Often, however, the court would not allow counsel to exceed the limit, and even the State was not immune to being cut off in the middle of important questioning.

Although defendants are not entitled to *voir dire* conducted by counsel, *State v. Biegenwald*, 106 *N.J.* 13, 29–30, 524 A.2d

130 (1987), the time-limit placed on counsel was especially harmful in light of the fact that the court itself did not ask probing, open-ended questions. Frequently, the court let ambiguous or troublesome answers stand without asking follow-up questions. In the *voir dire* of prospective juror Michael Stefanelli, for example, Mr. Stefanelli indicated he might be biased against ethnic minorities, including Hispanics. Incredibly, the trial court did not ask further questions.

Moreover, the court's use of close-ended, leading questions was not limited to questioning on the death penalty. In response to a question on the juror questionnaire about whether they would give greater weight to the testimony of a police officer, many jurors answered yes. The court invariably responded not by probing the prospective juror's views but by persuading, in effect, the juror to change his or her mind. *Cf. State v. Dixon, supra,* 125 *N.J.* at 271, 593 *A.*2d at 290 (Handler, J., dissenting in part and concurring in part) (the *voir dire* was inadequate because, along with other errors, the court asked leading questions calculated to produce "correct" answers).

In *Biegenwald* IV, *supra,* this Court held that the trial court's failure to conduct a searching *voir dire,* combined with the failure to ask jurors whether they would favor the death penalty for a defendant previously convicted of murder, required reversal of defendant's capital sentence. 126 *N.J.* at 43, 594 *A.*2d at 194. In *Williams* II, *supra,* the Court held that the trial court's failure to conduct a searching *voir dire,* combined with the failure to excuse for cause a juror who clearly should have been excused, required reversal of defendant's conviction and sentence. 113 *N.J.* at 445, 550 *A.*2d 1172. Here, all three errors are present. Thus, under both *Biegenwald* IV and *Williams* II, this Court should reverse defendant's conviction and sentence.

The record fully supports the conclusion that the overall *voir dire* was so wholly inadequate as to deprive defendant of his

right under the State Constitution to trial by a fair and impartial jury.

## II

The trial, in my view, was seriously prejudiced by the evidence relating to a prior murder conviction of defendant. Ten years before committing the present homicide, defendant had brutally stabbed to death his former girlfriend's fifteen-year-old daughter with whom he had been having sexual relations. Prior to trial, the court granted the State's motion to introduce evidence of defendant's prior murder conviction during the guilt phase of the trial. According to the State, defendant's alleged remarks to Michael Harrison and Blanca Flores that he had killed before and might have to kill again made the prior murder relevant to defendant's intent on the night of the Lucy Erazo stabbing. The prosecutor, in addition to eliciting testimony concerning the remarks during his direct examination of Harrison and Flores, repeated them in both his opening and closing guilt-phase arguments. He also introduced into evidence a redacted copy of defendant's prior convictions for the murder and carnal abuse of his girlfriend's daughter. This Court now rejects defendant's argument that the evidence should have been excluded under both *Evidence Rule* 55 and *Evidence Rule* 4. *Ante* at 130–132, 594 *A*.2d at 241–242.

"*Evidence Rule* 55 prohibits the introduction into evidence of other crimes or civil wrongs to prove a defendant's criminal disposition as a basis for establishing guilt of the crime charged." *State v. Stevens*, 115 *N.J.* 289, 293, 558 *A*.2d 833 (1989); *Evid.R.* 55. However, "[t]he Rule expressly permits such evidence to be admitted to prove other facts in issue, such as 'motive, intent, plan, knowledge, identity, or absence of mistake or accident'...." *Ibid.; Evid.R.* 55. The issue must be genuine and the other-crime evidence must be necessary for its proof. *Id.* at 301, 558 *A*.2d 833.

Although other-crime evidence may thus be admissible under *Evidence Rule* 55 to prove motive or intent, the admission of defendant's prior murder conviction in this case seems part of a disturbing trend on the part of trial courts in capital murder cases to allow the jury to consider any evidence that can be construed as relevant to motive or intent—no matter how attenuated or oblique the connection between the proffered evidence and defendant's motive or intent. It is a trend that this Court had done little to reverse. In *State v. Dixon*, 125 *N.J.* 223, 593 *A.*2d 266 (1991), the defendant had fatally struck a young girl once in the head with a sharp object during an attempted robbery and/or sexual assault. In his confession to police detectives, the defendant compared the killing to the film "10 to Midnight," stating: "it was like the movie, you know, the girl kept screaming and the guy hit her ... he stabbed her." 'At trial, the court allowed the jury to watch segments of the film that featured a naked psychopath, blood dripping from his body, brutally stabbing to death naked young women. The trial court accepted the State's argument that the scenes were relevant to the defendant's intent, because of the defendant's oblique reference to the film during his confession. On appeal, this Court brushed aside the defendant's argument that the film segments had prejudiced the guilt phase of his trial, suggesting (without stating outright) that their admission was at worst harmless error: "We might be inclined to reverse the guilt phase convictions if this were a case of less than over-whelming evidence of guilt." *Id.* at 251, 593 *A.*2d at 279; see also *id.* at 272–284, 593 *A.*2d at 290–296 (Handler, J., dissenting in part and concurring in part)

Here, only defendant's statement that he had killed before and might have to kill again was arguably relevant to his intent. Yet the State offered and the trial court allowed into evidence defendant's records of his prior conviction for murder as well as his conviction for carnal abuse—crimes committed ten years before—as proof of defendant's motive or intent toward an entirely unrelated victim. Despite any superficial

similarities to the present homicide, the fact that defendant's prior convictions were remote in time, *see Ramseur, supra,* 106 *N.J.* at 226, 524 *A.*2d 188 ("[t]he temporal remoteness of a wrong affects its probative value") and committed against an unrelated victim rendered those convictions irrelevant to defendant's intent on the night, ten years later, that he stabbed Lucy Erazo. There was simply no reason to admit into evidence the records of defendant's prior convictions. *See State v. Schumann,* 111 *N.J.* 470, 545 *A.*2d 168 (1988) (in prosecution for sexual assault of a young boy, to explain the absence of a "fresh complaint," testimony was admitted that defendant had told victim not to tell anyone about their sexual act because defendant had previously been sent to jail for engaging in similar activity with another boy who confided in his parents; because the complaint was in fact "fresh," the testimony was improperly admitted under both *Evidence Rule* 55 and *Evidence Rule* 4). *Cf. State v. Carroll,* 242 *N.J.Super.* 549, 564, 577 *A.*2d 862 (App.Div.1990) (in prosecution for murder of stepdaughter, the child of his second wife, defendant's statement that he had felt a "rage" against his first wife that had led him to "hurt" her was admissible because defendant stated that the rage was "identical" to the rage he felt for his second wife and caused him to "seek revenge").

Furthermore, "[e]vidence of past crimes does not automatically become admissible just because it is relevant to the issue of motive or intent. In each case the trial court must weigh the probative value of the evidence against its prejudicial effect." *State v. Ramseur, supra,* 106 *N.J.* at 265, 524 *A.*2d 188. If the probative value of the evidence is outweighed by threat of prejudice, the evidence should be excluded. *Id.* at 266, 524 *A.*2d 188; *Evid.R.* 4. This Court had recognized that in capital cases, the court must weigh other-crimes evidence carefully. *Ramseur,* 106 *N.J.* at 265–66, 524 *A.*2d 188. The Court has further recognized that evidence relevant in the guilt phase "might be so overwhelmed by prejudice in the sentencing phase by extraneous factors irrelevant to capital sentencing that the

admission of such evidence would almost inevitably require reversal of a death sentence." *State v. Dixon, supra,* 125 *N.J.* at 249, 593 *A.*2d at 279. I have repeatedly stated that "it is imperative that the potential for prejudice of such evidence in the *penalty* -phase trial be considered by the trial court in determining its admissibility in the *guilt* -phase trial." *State v. Harvey,* 121 *N.J.* 407, 449, 581 *A.*2d 483 (1990) (Handler, J., concurring in part and dissenting in part) (citing *State v. Pennington,* 119 *N.J.* 547, 561–63, 575 *A.*2d 816 (1990); *see also State v. Clausell,* 121 *N.J.* 298, 371–72, 580 *A.*2d 221 (Handler, J., concurring in part and dissenting in part); *State v. Long,* 119 *N.J.* 439, 513, 575 *A.*2d 435 (1990) (Handler, J., concurring in part and dissenting in part). This is particularly true when, as here, the evidence does double-duty as an aggravating factor. *See Pennington, supra,* 119 *N.J.* at 608, 575 *A.*2d 816. The Court has recently stated that when the State intends to submit aggravating factor *N.J.S.A.* 2C:11–3c(a) (that defendant has been convicted of another murder), the guilt and sentencing phases · of the trial should be heard by two different juries. *Biegenwald* IV, *supra,* 126 *N.J.* at 43–44, 594 *A.*2d 172. The Court explained that

> [b]ecause of the prejudice that could be engendered by *voir dire* prior to the guilt phase about a defendant's other murder convictions that are not otherwise admissible as evidence during that portion of the case ..., questioning [on whether the prior murder conviction would make the prospective juror favor the death penalty for defendant, see discussion *supra* at 119–121 should almost invariably come only after a jury has found a defendant death eligible. [*Id.* at 44, 594 *A.*2d 172.]

This holding evinces the Court's recognition that evidence of a prior murder conviction is extraordinarily and overwhelmingly harmful to a capital defendant. It strongly suggests that such evidence should rarely, if ever, be admissible in the guilt phase of a capital cause.

As harmful as the evidence of defendant's prior murder conviction was during the guilt phase of his trial, its prejudicial impact escalated incalculably in the sentencing phase. The State, having introduced evidence of the prior murder during

the guilt phase, proceeded to introduce the highly prejudicial details surrounding that murder at defendant's sentencing phase. The majority itself impliedly concedes this point. *Ante* at 137–139, 594 *A*.2d 232 (recommending that if State seeks death penalty on remand, court impanel separate juries to hear guilt and penalty phases; "A separate penalty-phase jury commends itself when guilt-phase evidence is so prejudicial that the same jury could not fairly sit on both phases of the trial" (citation omitted)).

The additional evidence relating to the prior murder was admitted under *N.J.S.A.* 2C:11–3c(2)(f), which provides:

Evidence offered by the State with regard to the establishment of a prior homicide conviction pursuant to paragraph (4)(a) of this subsection may include the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant.

The New Jersey Legislature added c(2)(f) to the capital murder statute by amendment effective June 2, 1985. *L.*1985, *c.* 178, sec. 2. In its original form, c(2)(f) provided: "Evidence offered by the State to establish the prior homicide pursuant to paragraph (4)(a) .... may include the circumstances surrounding the prior homicide." The provision was changed to its present form by Senate Committee amendment adopted March 1, 1984. The Senate Judiciary Committee Statement accompanying the amendment explains:

In order to avoid turning the sentencing proceeding into a second trial of the previous case and at the same time to provide the jury with some information about the prior conviction, the amendments would limit the circumstances of the prior homicide that could be introduced into evidence during the sentencing proceeding to: the identity and age of the victim; the manner of death and the relationship of the victim to the defendant, if any.

A prior murder under c(4)(a), as the Court in *Ramseur* noted, " 'narrow[s] the class of persons eligible for the death penalty.' " *Ramseur, supra,* 106 *N.J.* at 276, 524 *A*.2d 188 (quoting *Zant v. Stephens,* 462 *U.S.* 862, 877, 103 *S.Ct.* 2733, 2742, 77 *L.Ed.*2d 235, 249 (1983); *see also State v. Pennington, supra,* 119 *N.J.* at 586, 575 *A*.2d 816 ("evidence of a prior murder conviction is admissible as an aggravating factor in the penalty phase").

In our death penalty statute, c(2)(f) is intended to provide only limited evidence of a defendant's prior murder, to enable the jury to weigh c(4)(a) as an aggravating factor. *See Ramseur, supra,* 106 *N.J.* at 277, 524 *A.*2d 188. However, while knowledge of the details of the prior murder through c(2)(f) might help a jury determine whether a defendant is a serial killer or poses danger of killing again, it also carries the inherent danger that the jury will vote for death by dint of the brutality of the first murder. As defendant argues, "the more heinous the prior murder the greater the likelihood of a death sentence on the second murder."

Thus, here, pursuant to c(2)(f), the State introduced into evidence the judgment of conviction for the prior murder (including the prior sentence imposed); that the victim was Gladys Colon, the fifteen year-old daughter of defendant's former girlfriend; and that she had died of numerous stab wounds to the chest and back. Over defendant's objection, the State also introduced three pages of an autopsy report for Colon, including a human diagram outlining the stab wounds and a detailed description of anatomical diagnoses. In his penalty-phase summation, the prosecutor stated:

> I submit that the brutal murder of Gladys Colon and the brutal circumstances of the murder of Lucy Erazo outweigh anything with regard to defendant's state of mind, voluntary intoxication, age or anything that defen[dant] has offered on his behalf.

The court did not issue a limiting instruction on the use of details of the prior murder. Similarly, in *Stringer v. State,* 500 *So.*2d 928 (Miss.1986), in which a prosecutor urged the jury to sentence a defendant to death after he had been earlier sentenced to life imprisonment for killing someone else during the same incident, the prosecutor told the jury that he could not understand why the first jury had not returned a death sentence, and that this trial was the prosecutor's, State's, and the victims' relatives' "last chance for retribution." *Id.* at 939. The Mississippi Supreme Court found that the remarks alone did not constitute error, but that in combination with numerous

other instances of prosecutorial misconduct, those remarks had denied defendant a fair trial. *Ibid.* Here, as noted, the prosecutor asked the jury during his penalty-phase summation to sentence defendant to death for the two brutal murders. *Cf. State v. Pennington, supra,* 119 *N.J.* at 614, 575 *A.*2d 816 (prosecutor's description in his penalty-phase opening argument of defendant's prior murder in which, according to prosecutor, defendant "took a shotgun ..., shot a young thirty-year old man in the back of the leg with that shotgun and then blew away half his face," was reversible error.).

On balance, the application of c(2)(f) to allow excessive details surrounding the circumstances of the prior murder was seriously prejudicial and generated the unwholesome likelihood that the jury imposed the death penalty because it was impassioned by the brutality of the prior killing.

## III

The Court concedes that the evidence was insufficient to support the aggravating factor of c(4)(c). *Ante* at 137–139, 594 *A.*2d 232. I agree with that assessment. I write separately to reiterate my view that c(4)(c) continues to be so malleable as to make almost limitless the class of death-eligible defendants. *See Ramseur, supra,* 106 *N.J.* at 405, 524 *A.*2d 188 (Handler, J., dissenting). Because of its vagueness and overbreadth, c(4)(c) lends itself easily to overuse by prosecutors, thus raising the spectre of unbounded prosecutorial discretion to seek the death penalty.

In regard to the c(4)(c) factor, "the essence of the legislative concern is the defendant's state of mind.... Society's concern, the community's concern, the Legislature's concern, is to punish most harshly those who *intend* to inflict pain, harm, and suffering—in addition to intending death." *State v. Ramseur, supra,* 106 *N.J.* at 207–08, 524 *A.*2d 188. Encompassed within c(4)(c) is

the class of murders in which defendant intended to, and did in fact, cause extreme physical or mental suffering—in addition to death. The state of mind that we require corresponds to our Code's "purposeful" definition. Thus, the extreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death. [*Id.* at 208–09, 524 *A.*2d 188 (footnotes omitted).]

Evidence of torture or aggravated assault is often circumstantial and may be inferred from the circumstances of the case. *Id.* at 211 n. 38, 524 *A.*2d 188 n. 38; *State v. Matulewicz,* 115 *N.J.* 191, 194, 557 *A.*2d 1001 (1989). Applying those standards on several occasions, the Court has found c(4)(c) to be inapplicable. *Matulewicz, supra,* 115 *N.J.* at 200, 557 *A.*2d 1001 (defendant struck baby on head, threw her into crib, then shook her to death); *State v. Rose,* 112 *N.J.* 454, 527–33, 548 *A.*2d 1058 (defendant shot victim once in abdomen with shotgun); *State v. Biegenwald,* 106 *N.J.* 13, 51, 524 *A.*2d 130 (1987) (defendant shot victim four times in head at close range). In those cases, the Court determined that the evidence was insufficient to prove that defendant had intended the victim to endure pain and suffering while committing the murder.

In *State v. Hunt,* 115 *N.J.* 330, 385–89, 558 *A.*2d 1259 (1989), without deciding the issue, the Court discussed the quantum of evidence necessary to support c(4)(c) in a multiple stab wound case. There, the defendant rushed to the victim's apartment, woke him up, and stabbed him twenty-four times. In its analysis, the Court stated that

[i]n another case, the nature and number of wounds might bespeak an intent to inflict pain in addition to causing death. For example, multiple stab wounds, when combined with other evidence of defendant's intent, could support the contention that defendant knew or intended that the victim would suffer or that the defendant wanted the victim to know that he or she was about to be murdered. [*Id.* at 389, 558 *A.*2d 1259.]

The Court noted that the only evidence in support of c(4)(c) was that the victim "was stabbed twenty-four times, was shocked by the attack, and bled for twenty minutes before dying." *Id.* at 388, 558 *A.*2d 1259.

In my dissent in *Hunt,* I took issue with the Court's failure to reject the sufficiency of the evidence as support for c(4)(c).

Noting that the State had relied on "24 aggravated batteries" as its c(4)(c) evidence, I stressed that multiple stabbing evidence alone, without additional evidence demonstrating a torturous or sadistic intentional state of mind, cannot suffice as a matter of law to establish the aggravating factor of c(4)(c).

\* \* · \* \* \* \* \* \*

If the c(4)(c) factor could be sustained in this case, where the only evidence is several non-fatal wounds and death was not instantaneous, there would be "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." [*Id.* at 414, 558 A.2d 1259 (Handler, J., dissenting) (citation omitted).]

The murder in this case can fully be characterized as an impulsive stabbing in response to Lucy Erazo's threat to call the police. Lucy Erazo was drunk, and defendant too had much to drink. In contrast to *Hunt*, the fatal wound brought death immediately; there were few total wounds; other "non-fatal" wounds were superficial slash wounds; the entire event lasted approximately five minutes at most, and perhaps "happened in a matter of seconds."

This is not a close question. I thus find more troublesome the prosecutor's decision to rely on aggravating factor c(4)(c). One cannot reasonably draw from the evidence any "inference" that there was an intent to cause suffering separate and apart from the intent to kill. *See Matulewicz, supra,* 115 *N.J.* at 199–200, 557 *A.*2d 1001.

This case again points up the procedural spectre of unguided prosecutorial discretion. *See State v. Perry,* 124 *N.J.* 128, 133, 140–142, 590 *A.*2d 624 (Stein, J., concurring in part and dissenting in part) (questioning whether guidelines adopted by New Jersey County Prosecutors Association will prove "sufficiently specific to overcome the problem of arbitrariness in the designation of cases for capital prosecution"); *State v. Marshall,* 123 *N.J.* 1, 250–52, 586 *A.*2d 85 (1991) (Handler, J., dissenting); *State v. Di Frisco,* 118 *N.J.* 253, 303, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part); *State v. Matulewicz, supra,* 115 *N.J.* at 207, 557 *A.*2d 1001 (Handler, J., concurring); *State v. Koedatich,* 112 *N.J.* 225, 250–58, 548 *A.*2d

939 (1988); *id.*, 115 *N.J.* at 372–79, 558 *A.*2d 1259 (Handler, J., dissenting); *State v. Ramseur, supra,* 106 *N.J.* at 129, 524 *A.*2d 188; *id.*, 115 *N.J.* at 404–08, 558 *A.*2d 1259 (Handler, J., dissenting). In a related vein, this case underscores the prosecutorial vice of overcharging. Although the prosecutor asserted the c(4)(a) prior-murder factor as well as c(4)(c), this case might well not have been prosecuted as a capital cause had the c(4)(c) factor not been invalidly introduced. *See State v. Dixon, supra,* 125 *N.J.* at 260, 593 *A.*2d 266 (Handler, J., dissenting in part and concurring in part) (three invalidly-submitted aggravating factors converted likely non-capital case into capital case). Moreover, adding a second aggravating factor dramatically increased the State's ability to secure a death sentence. Capital juries in New Jersey are almost four times more likely to sentence a defendant to death when two aggravating factors are found than they are when only one is found. *See* Baldus, *Appendices and Tables to Second Interim Proportionality Report* at Appendix F (March 20, 1991) (Baldus Report). Those same juries are more than twice as likely to impose a death sentence when the c(4)(c) factor is found as a second aggravating factor than they are when c(4)(c) is found to exist as the sole aggravating factor. *Id.* at Appendix E, Table 4C. In the two cases in the Baldus Report in which c(4)(a) was found as the sole aggravating factor, neither case resulted in a death sentence; however, in the nine cases in which c(4)(a) and a second aggravating factor were found, death sentences were returned in *every* case. *Id.* at Appendix E, Table 4A. More significantly, in the five cases (including this one) in which juries found both the c(4)(a) and c(4)(c) factors as the only two aggravating factors, *all* resulted in death sentences. See *id.* at Appendix F, F–8 to F–15. Those figures help demonstrate the tremendous momentum generated by the c(4)(c) factor toward juries returning sentences of death.

We cannot continue to permit prosecutors to roust up evidence in search of extra aggravating factors to bolster their cases. I continue to believe that c(4)(c) is hopelessly overbroad

and vague, even with this Court's limiting interpretation of it in *Ramseur*. *Ramseur, supra,* 106 *N.J.* at 405, 524 *A.*2d 188 (Handler, J., dissenting) (slight evidentiary burden on State to establish aggravating factor to render case capital is particularly troublesome when that factor is vague and overbroad c(4)(c)). The c(4)(c) standard is inherently manipulable, and there is no reason to disbelieve that a jury confronted with a gory or shocking murder will not "infer" bases for that factor. For instance, "in cases where there are multiple wounds, the jury can find suffering or, if pain cannot be proved, mutilation." *Id.* at 401, 524 *A.*2d 188 (Handler, J., dissenting); Rosen, *The Especially Heinous Aggravating Circumstance in Capital Cases—The Standardless Standard,* 64 *N.C.L.Rev.* 941 (1986). Just as I believe that c(4)(c) can lure a juror into finding almost *any* murder capital, see *Ramseur, supra,* 106 *N.J.* at 402, 524 *A.*2d 188 (Handler, J., dissenting), I continue to feel that strict standards are necessary to restrict prosecutors' overuse of that factor. Such overuse manifested itself egregiously in this case. *Cf. Perry, supra,* 124 *N.J.* at 142, 590 *A.*2d 624 (Stein, J., concurring in part and dissenting in part) (prosecution used c(4)(c) factor to render case capital: "The impression is unavoidable that there was scant basis in the accumulated evidence to distinguish this homicide as one warranting a capital prosecution.").

In sum, the reliance by the State on c(4)(c) in the face of insufficient evidence not only warrants a reversal of defendant's death sentence, it exemplifies an intolerable exercise of the death-penalty prosecutorial authority.

## IV

Another issue requires comment. Certain evidence elicited during the trial consisted of victim-impact evidence. The State argues that there was testimony by various witnesses that described Lucy Erazo as a "religious," "wonderful" woman, and the mother of ten children. The prosecutor speculated

aloud to the jury that as Lucy Erazo lay dying, "her thoughts were for her family." Allegedly the Rodriguez children, including Migdalia Rodriguez, testified that she had reported defendant's parole violation to the parole board because defendant "was doing a lot of things to [her] sisters." The prosecutor argued that the jury need not show defendant mercy because defendant had shown no mercy to his wife when he killed her.

In *Booth v. Maryland*, 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987), the United States Supreme Court invalidated on eighth amendment grounds a Maryland statute that required the introduction of victim-impact statements at the sentencing phase of a capital trial. In *Booth* the prosecution presented extensive information on "the personal characteristics of the victims and the emotional impact of the crimes on the family, as well as the family members' opinions and characterizations of the crimes and the defendant." *Id.* at 502, 107 *S.Ct.* at 2533, 94 *L.Ed.*2d at 448. The Court concluded that such "information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 502–03, 107 *S.Ct.* at 2533, 94 *L.Ed.*2d at 448.

In *South Carolina v. Gathers*, 490 *U.S.* 805, 109 *S.Ct.* 2207, 104 *L.Ed.*2d 876 (1989), the Supreme Court affirmed the Supreme Court of South Carolina's reversal of the defendant's death sentence, finding that certain comments made by the prosecutor had improperly referred to the victim's personal characteristics. There, defendant had assaulted, robbed, and killed a self-proclaimed preacher in a park, scattering various of the victim's religious articles on the ground in the process. During his penalty-phase summation, the prosecutor "read to the jury at length from the religious tract the victim was carrying, and commented on the personal qualities he inferred from [the victim's] possession of the [tract] and [his] voter registration card." *Id.* at 811, 109 *S.Ct.* at 2211, 104 *L.Ed.*2d at 883. The Court found that such information had no relevance

to the circumstances of the crime, since it was unlikely that the defendant had read the tract or voter card.

We have taken a similar approach with respect to such evidence, and apply a strict standard governing its admissibility and use. In *Williams* II, *supra,* 113 *N.J.* at 446–54, 550 *A.*2d 1172, the prosecutor pursued a pattern of commentary on the virtue of the victim, calling her "[b]right, beautiful, religious, a member of her church choir," and discussing what had been her future marriage plans. *Id.* at 448, 550 *A.*2d 1172. The Court stated:

> Any capital trial will necessarily involve testimony and physical evidence pertaining to the victim. This evidence, though admissible, cannot be used in a manner calculated to so confuse or impassion the jury that it inappropriately intertwines irrelevant emotional considerations with relevant evidence. There are occasions when evidence relating to the victim's character and personality may be probative of critical aspects of the trial, *e.g.,* defendant's assertion of self-defense or provocation. [*Id.* at 451, 550 *A.*2d 1172.]

The Court acknowledged in *Williams* II the trend toward victim-impact legislation, *i.e.,* legislation that would permit victims' interests to be addressed in criminal matters. Nevertheless, even though such legislation exists in New Jersey, "our law does not regard a crime committed against a particularly virtuous person as more heinous than one committed against a victim whose moral qualities are perhaps less noteworthy or apparent. The law exists to protect all persons equally." *Id.* at 450, 550 *A.*2d 1172. Moreover,

> [i]t is constitutionally required that juries in capital trials reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary. Failure to purge successfully such comments from admittedly emotion-charged proceedings creates the unacceptable risk that what will result is the arbitrary and capricious imposition of the death penalty. [*Id.* at 453–54, 550 *A.*2d 1172 (citing *Booth v. Maryland, supra,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440.]

Such comments or evidence serve to impassion the jury without adding evidence relevant to the defendant or the crime charged. *Hightower, supra,* 120 *N.J.* at 411, 577 *A.*2d 99; *Williams* II, *supra,* 113 *N.J.* at 474, 550 *A.*2d 1172 (Handler, J., concurring).

In *Williams* II, we recognized the holding of *Booth* and *Gathers*. Our victim-impact cases subsequent to *Williams* II have relied heavily on *Williams* II—rather than federal precedent—as the principal exposition of victim-impact-evidence law in capital trials in New Jersey. *See, e.g., State v. Harvey*, 121 *N.J.* 407, 425, 581 *A.*2d 483 (1990); *State v. Clausell*, 121 *N.J.* 298, 341, 580 *A.*2d 221 (1990); *State v. Hightower*, 120 *N.J.* 378, 410–12, 577 *A.*2d 99 (1990); *State v. Pennington, supra*, 119 *N.J.* at 566–71, 575 *A.*2d 816; *State v. Coyle*, 119 *N.J.* 194, 231–32, 574 *A.*2d 951 (1990).

In the wake of the reversal of both *Booth* and *Gathers* by *Payne v. Tennessee*, —— *U.S.* ——, 111 *S.Ct.* 2597, 115 *L.Ed.*2d 720 (1991), we should make clear that our standard is fixed firmly on state constitutional principles of due process and reasonable punishments and independent precepts of fundamental fairness. This is particularly important in view of the retrenchment by the United States Supreme Court with respect to the protections afforded defendants in capital cases. See discussion *supra* at 119–120, 594 *A.*2d 232.

In *Payne v. Tennessee, supra,* the defendant brutally stabbed a mother and her two young children. The mother and daughter were killed, but the son survived. The defendant was convicted of two counts of murder and one count of assault with intent to commit murder. During the penalty trial, the prosecutor elicited testimony from the children's grandmother on the effect of the murders on the surviving young boy. In summation, the prosecutor talked extensively about the effect of the murders on the boy, what his sister would miss in life, and the qualities of the mother.

For instance, the prosecutor told the jury:

No one will ever know about [the young girl] because she never had the chance to grow up. Her life was taken from her at the age of two years old. So there won't be a high school principal to talk about [her], and there won't be anyone to take her to her high school prom.... [The young boy's] mother will never kiss him good night or pat him as he goes off to bed, or hold him and sing a lullaby.... [The boy] doesn't have anyone to watch cartoons with him.... [*Id.* at ——, 111 *S.Ct.* at 2603].

He then told the jury that although it could not do anything for the mother and the young girl, with its verdict if could do something for the boy. *Id.* at ——, 111 *S.Ct.* at 2601.

Overruling *Booth* and *Gathers*, the Court found the grandmother's testimony and the prosecutor's comments acceptable. It concluded that victim-impact evidence demonstrates a defendant's moral culpability and blameworthiness: "Victim-impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id.* at ——, 111 *S.Ct.* at 2608. "It is designed to show ... each *victim's* 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." *Ibid.* The Court thus held that the eighth amendment does not prohibit the introduction of victim-impact evidence at a capital-sentencing hearing if a state permits the introduction of such evidence. *Ibid.*

In my view, under our notions of fundamental fairness and due process, victim-impact evidence cannot be allowed in capital cases. That the protections afforded by our Constitution exceed those of the federal Constitution in this area is pointed up by the fact that we have prohibited the introduction of victim-impact evidence not only during the penalty phase of a capital trial but during the guilt phase as well. *Williams* II, *supra*, 113 *N.J.* at 451–52, 550 *A.*2d 1172 ("Where ... the victim's character has no bearing on the substantive issue of guilt or the penalty to be imposed, the prosecution may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury."). By contrast, *Booth* and *Gathers* addressed themselves to sentencing trials only. At any rate, as I stated in *Williams* II, "federal decisions are unreliable authority in determining our own constitutional death-penalty jurisprudence." *Williams* II, *supra*, 113 *N.J.* at 465, 550 *A.*2d 1172 (Handler, J., concurring). I pointed out that our decisions in *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, and *State v. Moore,* 113 *N.J.* 239, 550 *A.*2d 117 (1988),

adhered to the rationale of *Enmund v. Florida,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982), and refused to follow *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), which "significantly curtailed" *Enmund. Ibid.* As noted, our victim-impact jurisprudence has relied primarily on *Williams* II, which has broader scope than *Booth* and *Gathers.* Having embraced the spirit of *Booth* and *Gathers,* we should repudiate *Payne.*

Only one of defendant's victim-impact arguments in this case deserves attention. During his summation, ostensibly to rebut the c(5)(h) mitigating factor, the prosecutor argued:

> The other portion of that factor has to do with the fact that the defendant says the death penalty will be a hardship on him and on his family. Consider that, but put it in perspective. I feel sorry for the defendant's family, but I also feel sorry for the victim's family.
>
> The family asked you for mercy. Consider it, but put it in perspective, ladies and gentlemen. *What mercy did the defendant show Lucy Erazo? What justice did she receive?* (Emphasis added.)

That kind of comment may well tend to mislead a jury, because it renders the establishment of the c(5)(h) mitigating factor a contest between a defendant and his victim. *Marshall, supra,* 123 *N.J.* at 238–39, 586 *A.*2d 85 (Handler, J., dissenting); *see also id.* at 163–64, 586 *A.*2d 85 (majority opinion) (inappropriate but not reversible error for prosecutor to state in rebuttal of mitigating factors that victim "had no prior criminal history, ... was civic-minded, and [was not given] the option of thirty years"). It improperly asked the jury to weigh the comparative grief of the two families and to disregard evidence in mitigation because the victim had no recourse in mercy.

In *State v. Monroe,* 397 *So.*2d 1258 (La.1981), *cert. denied,* 463 *U.S.* 1229, 103 *S.Ct.* 3571, 77 *L.Ed.*2d 1411, *reh'g denied,* 463 *U.S.* 1249, 104 *S.Ct.* 36, 77 *L.Ed.*2d 1455 (1983), defense counsel attacked the deterrence function of the death penalty in his penalty phase summation. The prosecution rebutted that argument by explaining that the murder at issue merited the death penalty, through which he asked the jury "to give us justice." *Id.* at 1270. The Supreme Court of Louisiana, al-

though not finding reversible error in the circumstances, aptly observed:

> Some of the closing argument might be interpreted as a plea for the jury to disregard the constitution and the law, and simply do to the defendant what they had found the defendant had done to the victim, and take his life. The prosecutor tried to say that in asking for the death penalty, he asked for "nothing out of the ordinary," and that the jury should simply give the defendant the same that the defendant gave the victim.

> \*　　\*　　\*　　\*　　\*　　.\*　　\*　　\*

> A system of capital punishment which permits the exaction of an eye for an eye, a tooth for a tooth, and a life for a life will not pass constitutional muster. Such argument is improper. To seem to urge what the defendant had done to the victim ... is improper. [*Id.* at 1270–71.]

The State urges that the prosecutor's comment here was not error because it was not "a plea to the jury to do to defendant what he had done to Lucy Erazo, but rather, a proper reminder of the nature of defendant's actions in rebuttal to defendant's evidence and arguments at the penalty phase." Nevertheless, the prosecutor could have rebutted defendant's pleas for mercy without asking the jury to consider the lack of mercy shown Lucy Erazo. The statement improperly blurs the proper focus of mitigating factors, and is thus inappropriate.

In sum, even if these aspects of the trial do not warrant reversal, the Court should make it crystal clear that under our state constitutional notions of due process and reasonable punishments and independent standards of fundamental fairness in capital-murder prosecutions, such victim-impact statements must be prohibited.

# V

I concur in part and dissent in part from the judgment of the Court.

Justice GARIBALDI concur in result.

Justice HANDLER concurs and dissents.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal* —Justice Handler—1.