**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0514-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MADA T. EOFF,

    Defendant-Appellant.

_____

Submitted October 25, 2021 – Decided March 4, 2022

Before Judges Messano, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-06-0360.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael Confusione, Designated Counsel, on the briefs).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Tasha Kersey, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

On September 18, 2016, at approximately 2:49 p.m., Trenton police responded to shots fired near Prospect Street and East Stuyvesant Avenue. They discovered the lifeless body of nineteen-year-old Lance Beckett in a grassy alley behind nearby houses on Rutherford Avenue; Beckett was pronounced dead at the scene, the victim of multiple gunshot wounds. Authorities charged defendant Mada T. Eoff, and co-defendants, Quashawn Emanuel and his cousin Omar Kennedy, with Beckett's homicide.

Defendant was seventeen years old at the time, and the State moved to waive jurisdiction from the Family Part to the Law Division and prosecute defendant as an adult. See N.J.S.A. 2A:4A-26.1; Rule 5:22-2. The Family Part judge held a hearing and granted the State's request. A Mercer County grand jury returned an indictment charging defendant, Emanuel and Kennedy with first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1).

Defendant was tried separately. Emanuel, who pled guilty to second-degree manslaughter with a maximum sentence recommendation of eight years' imprisonment, was the State's key witness at trial.[1] The jury convicted defendant

---

[1] At the time of trial, the charges against Kennedy remained pending.

of murder but acquitted him of the weapons offenses. After denying motions for judgment notwithstanding the verdict (JNOV), Rule 3:18-2, or alternatively a new trial, Rule 3:20-1, the judge sentenced defendant to a thirty-eight-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Before us, defendant raises the following points for our consideration:

POINT 1

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO TRY [DEFENDANT] AS AN ADULT IN THE LAW DIVISION.

POINT 2

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR ACQUITTAL, [JNOV], AND NEW TRIAL.

POINT 3

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

In a pro se supplemental brief, defendant raises the following arguments:

POINT I

THE TRIAL COURT ERRED WHEN IT FAILED TO INCLUDE ACCOMPLICE LIABILITY OR CO-CONSPIRATOR IN THE JURY CHARGE

A-0514-18

POINT II

TRIAL COURT ERRED WHEN IT FAILED TO GRANT [DEFENDANT] A MISTRIAL

POINT III

[DEFENDANT] MUST BE RE-SENTENCED PURSUANT TO THE NEW LEGISLAT[ION] SIGNED INTO LAW BY GOVERNOR MURPHY ON OCTOBER 19, 2020.[2]

After designated counsel filed his brief, the Office of the Public Defender moved to order additional transcripts of jury selection. We granted that motion, and, after receipt of those transcripts, counsel filed a letter pursuant to Rule 2:6-11(d), citing the Court's grant of certification of our judgment in State v. Little,

---

[2] In a letter filed pursuant to Rule 2:6-11(d), counsel advanced the same argument. The referenced legislation, effective October 19, 2020, well after the trial in this case, amended N.J.S.A. 2C:44-1(b) by adding a new mitigating sentencing factor that "only requires a finding . . . '[t]he defendant was under [twenty-six] years of age at the time of the commission of the offense.'" State v. Tormasi, 466 N.J. Super. 51, 66 (App. Div. 2021) (first alteration in original) (quoting N.J.S.A. 2C:44-1(b)(14)), certif. granted and remanded on other grounds, ___ N.J. ___ (2022). The Court recently heard argument in State v. Lane, certif. granted, 248 N.J. 534 (2021), where it considered whether the new mitigating sentencing factor applied retroactively. Unless and until the Court holds to the contrary in Lane, we see no reason to deviate from our holding in State v. Bellamy, 468 N.J. Super. 29, 46–48 (App. Div. 2021), that mitigating factor fourteen does not apply retroactively to sentences imposed prior to the effective date of N.J.S.A. 2C:44-1(b)(14), and may properly be applied only to sentencings, including re-sentencings following a remand on appeal, occurring on or after N.J.S.A. 2C:44-1(b)(14)'s October 19, 2019 effective date.

A-0514-18

No. A-4146-17 (App. Div. Feb. 5, 2020).  See 243 N.J. 533 (2020).  Although he did not have the benefit of the Court's subsequent decision affirming our judgment as modified, see State v. Little, 246 N.J. 402 (2021), defendant contends a question posed by the judge to all prospective jurors during jury selection violated his right to a fair trial.

We have considered these arguments in light of the record and applicable legal standards and reverse.

I.

When police processed the homicide scene, they found a cell phone and blue sweatshirt on the ground but were unable to obtain fingerprints, trace evidence or DNA from either.  There were no shell casings, and the State Police could not access the cell phone.  However, police were able to obtain surveillance video footage from a nearby home and stores.  The footage showed Beckett in the company of the three co-defendants as they walked into the alleyway and out of the cameras' view.  Defendant was wearing a blue sweatshirt.  The video footage was shown to the jury.

Detective Michael Castaldo of the Mercer County Prosecutor's Office testified that investigators identified and located Emanuel using the surveillance footage, canvassing witnesses at the scene, and through photos on Facebook.

During questioning by the officers over two successive days, Emanuel ultimately named defendant as the shooter. Police executed a search warrant at defendant's home, which yielded nothing of evidentiary value.

At trial, Emanuel testified that he and Kennedy were present at Beckett's killing. Emanuel knew Beckett for several years beforehand; both had fathered a child with the same woman. Their relationship had "ups and downs," and Emanuel acknowledged that approximately one year earlier, he was robbed, and it was rumored Beckett was involved. Emanuel also knew defendant and had a cordial relationship with him.

On the day of the murder, Emanuel received separate telephone calls from Kennedy and Beckett, and he agreed to meet them later that day. After first meeting Beckett and then Kennedy, all three went to a deli on Prospect Avenue. Near the deli, they encountered defendant, who was wearing a blue hooded sweatshirt. Defendant left and returned about twenty minutes later; he telephoned Emanuel from a short distance away. According to Emanuel, defendant said he was going to "bang bro," which Emanuel understood to mean defendant intended to harm Beckett. Emanuel testified it was rumored that Beckett stole a gun from Emanuel's uncle, nicknamed "Crazy Horse." Defendant told Emanuel, "I got Crazy Horse," which Emanuel took to mean defendant

6

would hurt Beckett as payback for his theft of Crazy Horse's gun. Emanuel did not tell Beckett about the call.

Shortly thereafter, Emanuel, Beckett, and Kennedy were standing in front of a liquor store near the deli when defendant approached and asked if they wanted to see a gun, which defendant described as an "AR," and claimed was hidden nearby. The group agreed and followed defendant toward an alley near Rutherford Avenue. Defendant directed the group down the alley, where he said he hid the gun. Except for Beckett, the group searched for the gun. Emanuel described what happened next:

> From there I heard [defendant] say, you don't want to help them look for it? And a shot fired off. When a shot fired off my back was still turned. By the time I turned, the second shot fired. Now Lance done say, oh shit, and he started running. So by the time he did that I looked up and he had a hole in his back. . . . The rest of the shots went off, about three – three more shots. Like five total.

Emanuel testified that he saw defendant fire the shots using a stainless-steel revolver. After the shooting, defendant and Kennedy immediately ran from the scene; Emanuel hid in the bushes. Emanuel testified that before Kennedy fled, he jumped on Beckett's head. Although Beckett was still breathing, Emanuel thought there was nothing he could do to help and ran too.

A-0514-18

On the day after the shooting, Emanuel gave detectives a statement about the homicide which, he admitted included "fake names" and "bogus stuff," suggesting that someone named "Little Marty" had committed the murder. He gave another statement to detectives the next day and for the first time identified defendant as the person who shot Beckett.

The State introduced records from the cellphone service provider confirming shortly before the men went toward the alley and shots rang out, Emanuel's phone received a call from defendant's phone. When the State rested, defendant moved for a judgment of acquittal pursuant to Rule 3:18-1, which the judge denied.

Defendant did not testify and recalled only Detective Castaldo as a witness. He provided brief and inconsequential testimony about the crime scene.

The theme of defense counsel's summation was that Emanuel, not defendant, shot Beckett. Counsel noted that Crazy Horse was Emanuel's uncle, and, if anyone had a motive to shoot Beckett — the alleged thief of Crazy Horse's gun — it was Emanuel, not defendant. Defense counsel pointed out Emanuel's claim, included in his statements to police, that Beckett had "set him up" to be robbed one year earlier.

A-0514-18

The prosecutor argued that the video footage and phone records corroborated key points in Emanuel's testimony. He noted that Emanuel was alone with Beckett for some time before the others arrived, and if he wanted to shoot Beckett he had ample opportunity to do so. Despite the absence of any DNA or trace evidence to support the assertion, the prosecutor suggested the blue sweatshirt found in the alley was the same sweatshirt defendant was wearing in the video footage, and that it was carefully placed on the ground as defendant fled, fully intending at some point to retrieve it. He noted the phone records corroborated Emanuel's testimony that defendant called him shortly before the shooting.

The jury deliberated over parts of three days, with significant time consumed by the playback of testimony and responses to numerous questions. As noted, the jury found defendant guilty of murder but acquitted him of the other charges.

## II.

Initially, we address defendant's contention that it was error for the Family Part judge to grant the State's motion to transfer jurisdiction to the Law Division. Defendant argues that most of the statutory factors contained in N.J.S.A. 2A:4A-26.1 weighed in favor of defendant. We disagree.

9

The waiver statute was amended effective March 1, 2016, and reflects the Legislature's intention, among other things, to replace the previous waiver procedure "with a streamlined process for determining whether a juvenile case should be transferred to an adult criminal court." Assemb. Appropriations Comm. Statement to S. 2003 2 (June 15, 2015). Under the amended law applicable to this case,

> the prosecution must offer proof of two things: (1) that the juvenile was fifteen years or older at the time of the alleged delinquent act, N.J.S.A. 2A:4A-26.1(c)(1), (as compared to fourteen years or older under the prior law, N.J.S.A. 2A:4A-26(a)(1)); and (2) that there is probable cause to believe that the act, if committed by an adult, would constitute one of a number of listed offenses, N.J.S.A. 2A:4A-26.1(c)(2).
>
> [State in re N.H., 226 N.J. 242, 251 (2016).]

"[C]riminal homicide, other than death by auto," is one of the enumerated offenses. N.J.S.A. 2A:4A-26.1(c)(2)(a). The statute requires the waiver motion be "accompanied by a written statement of reasons" from the prosecutor "clearly setting forth the facts used in assessing all [of the enumerated waiver] factors . . . together with an explanation as to how evaluation of those facts supports waiver for each particular juvenile." N.J.S.A. 2A:4A-26.1(a); see also State in re Z.S., 464 N.J. Super. 507, 516 (App. Div. 2020).

Pursuant to the revised statute:

The court may deny a motion by the prosecutor to waive jurisdiction of a juvenile delinquency case if it is clearly convinced that the prosecutor abused his discretion in considering the following factors in deciding whether to seek a waiver:

(a) The nature and circumstances of the offense charged;

(b) Whether the offense was against a person or property, allocating more weight for crimes against the person;

(c) Degree of the juvenile's culpability;

(d) Age and maturity of the juvenile;

(e) Any classification that the juvenile is eligible for special education to the extent this information is provided to the prosecution by the juvenile or by the court;

(f) Degree of criminal sophistication exhibited by the juvenile;

(g) Nature and extent of any prior history of delinquency of the juvenile and dispositions imposed for those adjudications;

(h) If the juvenile previously served a custodial disposition in a State juvenile facility operated by the Juvenile Justice Commission, and the response of the juvenile to the programs provided at the facility to the extent this information is

11

provided to the prosecution by the Juvenile
Justice Commission;

(i) Current or prior involvement of the
juvenile with child welfare agencies;

(j) Evidence of mental health concerns,
substance abuse, or emotional instability of
the juvenile to the extent this information
is provided to the prosecution by the
juvenile or by the court; and

(k) If there is an identifiable victim, the
input of the victim or victim's family.

[N.J.S.A. 2A:4A-26.1(c)(3) (emphasis added).]

An abuse of discretion may be found where the decision failed to consider all relevant factors, considered irrelevant or inappropriate factors, or "amounted to a clear error in judgment." State in re V.A., 212 N.J. 1, 22 (2012) (quoting State v. Bender, 80 N.J. 84, 93 (1979)). "The revised statute does continue the strong presumption in favor of waiver for certain juveniles who commit serious acts and maintains the associated 'heavy burden' on the juvenile to defeat a waiver motion." Z.S., 464 N.J. Super. at 519 (quoting State v. R.G.D., 108 N.J. 1, 12 (1987)).

The prosecutor's written statement of reasons in this case was thorough and complied with the requirements of the statute. It tracked and commented on each of the eleven factors in N.J.S.A. 2A:4A-26.1 with a reasonable level of

explanation. The prosecutor candidly acknowledged that some of the factors weighed in defendant's favor and against waiver. Defendant's other contentions regarding the prosecutor's statement of reasons lack sufficient merit to warrant extensive discussion. R. 2:11-3(e)(2).

The Family Part judge, in turn, considered the evidence produced by the State, including the surveillance video footage and a statement Kennedy gave to police in which he, too, alleged defendant shot Beckett. He considered defendant's educational records and participation in behavioral counseling. In sum, the judge properly concluded the prosecutor had not clearly and convincingly abused his discretion in seeking to transfer jurisdiction to the Law Division, and we affirm that order.

## III.

It is well settled that a defendant is entitled to be tried "before an impartial jury." State v. Loftin, 191 N.J. 172, 187 (2007). "Our case law consistently endorses voir dire questions that 'probe the minds of the prospective jurors to ascertain whether they hold biases that would interfere with their ability to decide the case fairly and impartially.'" Little, 246 N.J. at 417 (quoting State v. Erazo, 126 N.J. 112, 129 (1991)). "[I]nquiring about a juror's ability to follow the trial judge's instructions or to deliberate with an open mind," is entirely

13

appropriate, "so long as the questions do not indoctrinate prospective jurors about the issues that the jury will decide." Ibid. (citing State v. Fortin, 178 N.J. 540, 577 (2004)).

"We review the trial court's conduct of voir dire . . . in accordance with a deferential standard." Id. at 413. "[A] trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury.'" Ibid. (quoting State v. Winder, 200 N.J. 231, 252 (2009)). Relying on Little, defendant contends he was denied a fair trial because of a question posed to prospective jurors during voir dire.

In Little, the defendant was charged with aggravated assault and weapons offenses. 246 N.J. at 406. The gun allegedly used in commission of the crimes was never recovered. Id. at 407. Over objection of defense counsel, and after modifying the question as first proposed by the prosecutor, the judge agreed to ask prospective jurors the following: "[t]he law does not require that the State recover a gun, even though the defendant has been charged with weapons-related offenses. If the State does not produce the physical firearm allegedly used in this case will this affect your ability as a juror?" Id. at 409 (alteration in original).

Although most prospective jurors answered in the negative, three expressed some reservations. Id. at 410. The prosecutor used a peremptory challenge to excuse all three. Id. at 410–11. To further clarify, the judge subtly modified the question as follows:

> The law does not require that the State produce a gun at trial even though the defendant has been charged with weapons offenses. If the State did not recover and does not produce the gun allegedly used in this case, but presents evidence in the form of testimony, how will this affect your ability as a juror?
>
> [Id. at 411.]

"In response to the revised question, the majority of the prospective jurors stated that the State's inability to produce a gun would not affect their ability to serve as jurors. Several commented that they would consider all the evidence in deciding the case." Ibid. The State exercised peremptory challenges for two jurors who expressed some reservations in responding to the revised inquiry. Ibid. On appeal, we reversed, "agree[ing] with [the] defendant that the questions asked of prospective jurors during jury selection predisposed the jury to ignore the fact that no gun was recovered and to find defendant guilty." Id. at 412.

The Court noted it had "not previously considered the propriety of voir dire questions addressing the State's inability to produce a particular category of evidence at trial," but held "[i]n appropriate cases, the State's inability to present

15

a particular category of evidence can be a legitimate subject for the trial judge to address in voir dire." Id. at 417. Particularly relevant to this appeal, the Court cited two decisions from other states that "upheld inquiry into prospective jurors' views on the prosecution's inability to present specific categories of evidence," specifically, DNA or fingerprint evidence. Ibid. n.1 (citing Commonwealth v. Gray, 990 N.E.2d 528, 536–37 (Mass. 2013); Goff v. State, 14 So. 3d 625, 652–53 (Miss. 2009)).

The Court agreed that the trial court's question regarding the "absence of the weapon allegedly possessed by [the] defendant was a legitimate area of inquiry in voir dire." Id. at 419. But the Court explained:

> A jury, however, would be permitted to consider the State's inability to produce the handgun at issue as a factor when it decided whether the State had met its burden to prove beyond a reasonable doubt the elements of each offense. That aspect of the governing law was not explained in either version of the question asked to prospective jurors in this case. Neither question posed by the trial court presented the issue to the jurors in a balanced manner.
>
> . . . The questions posed to prospective jurors about the weapon, however, improperly suggested that jurors should not consider the absence of a handgun as a factor when they evaluated the State's proofs.
>
> [Ibid. (emphasis added).]

The Court held "[i]f a trial court inquires during voir dire about the absence of evidence, it should pose a balanced question." Id. at 420. It proposed the trial court use the following language to make inquiry of prospective jurors if the case were tried again:

> The State is not legally required to produce a gun if a defendant is charged with weapons offenses, but you as a juror may choose to consider the absence of any evidence in deciding whether the State has met its burden of proving defendant guilty beyond a reasonable doubt. If the State did not recover and does not produce the gun allegedly used in this case, but presents evidence in the form of testimony, will you be able to be a fair and impartial juror and decide whether the State has proven that defendant is guilty beyond a reasonable doubt of the offenses charged?
>
> [Ibid. (emphasis added).]

As noted, in this case, there was no DNA evidence, trace evidence, or fingerprints recovered from the homicide scene or anywhere else that linked defendant to Beckett's murder. During jury selection, in addition to using the model voir dire questions, the judge posed without objection the following question, or slight variations thereof, to each potential juror individually and privately at a courtroom podium:

> Sometimes prosecutors present cases where there's no forensic evidence such as fingerprints or DNA. Do you believe that the prosecutor, the State of New Jersey can

reach its burden of proof beyond a reasonable doubt without any type of scientific proofs?[3]

In most instances, regardless of the juror's response, the judge followed up with an open-ended request that the juror explain his or her answer and permitted the prosecutor or defense counsel to pose additional questions to the juror. Two jurors who said scientific proof would be necessary were excused for cause; one, on motion of the prosecutor, the other on the court's own motion.

The prosecutor used a total of eight peremptory challenges; defense counsel used eleven. We cannot discern a pattern in the use of these challenges necessarily related to the initial answers given by these jurors or colloquies that followed. However, neither the judge nor counsel "presented the issue to the jurors in [the] balanced manner" required by Little. Id. at 419. Jurors were never told they could "consider the absence of any [forensic] evidence in deciding whether the State has met its burden of proving defendant guilty beyond a reasonable doubt." Id. at 420.

---

[3] The appellate record does not include any discussion about this question prior to the judge posing it to each juror. Logically, the prosecutor must have requested its use, and while the record as it exists does not reveal defense counsel objected to the question, we cannot say whether the issue was discussed in proceedings that were not transcribed.

That the absence of forensic evidence was something jurors could consider in deciding whether the State carried its burden of proof arose tangentially with only two of the fourteen jurors ultimately seated. We quote from the transcript:

> Prosecutor: If there's a case where someone is charged with a crime but there's no DNA or fingerprints linking them to it, you would hear testimony from witnesses, would you be able to evaluate their testimony? If they give you enough would you be comfortable saying you know what, I believe what the witnesses told me and I think that this person has been proven guilty beyond a reasonable doubt? Could you get that from just witnesses without doing that?
>
> Juror #6: I think that I would be able to based on the witnesses and their testimonies. But I think I would be able to come up with something other than actually DNA.
>
> Prosecutor: <u>And the opposite is true, if it isn't enough</u> —
>
> Juror #6: Right, of course.
>
> [(Emphasis added).]

Juror #8 responded to the initial question: "That's a tough one. I guess if the . . . non-scientific evidence is very good and from reliable sources, then I guess it's true." The judge asked, "And if the evidence is not reliable you would return a verdict of not guilty[?]" The juror answered, "I would do that, yeah."

19

It is difficult to discern whether the following colloquy with Juror #7, who initially said she did not think the State could meet its burden of proof without scientific evidence, touched on the subject:

> Judge:  You think they need scientific proofs.
>
> Juror #7:  Yeah.  They would need something.
>
> Judge:  So in no case.  Even if a witness seems to be very believable, you find the prosecutor cannot meet its burden of proof unless they have some scientific proofs linking the defendant to a crime?
>
> Juror #7:  . . . I guess.  ([I]naudible) scientific. You would think (inaudible) it can be proved, you know.
>
> Judge:  Right.  Well, I'm gonna ask the attorneys if they have any follow up questions.
>
> Prosecutor:  . . . I do.  I just want to (inaudible) a little bit further.
>
> . . . .
>
> As the judge says, as a juror you hear testimony from witnesses.
>
> . . . .
>
> And . . . I don't want to talk about this case 'cause that's gonna happen later.
>
> . . . .
>
> You'll hear testimony.  But a hypothetical.  When you're sitting as a juror and you (inaudible) of an

eyewitness and you believe that witness . . . will be credible and the witness tells you, "I saw it," . . . whatever the crime is, "I watched it with my own two [e]yes."  If you found that witness to be credible and you believed her and you were firmly convinced that they're telling the truth, would you still not find the defendant guilty if there wasn't scientific evidence to support that?

Juror #7:  Yeah. (inaudible)

Prosecutor:  So you need something more.

Juror #7:  Yeah.

Prosecutor:  Even if you were to believe what they were telling you.

Juror #7:  Well, no. If I believe what they tell me and they or their character is, you know, as being someone who's honest or could be, I'd say, "Yeah."  I wouldn't have any doubts that they –

Prosecutor:  And . . . I don't want to (inaudible) if you can't consider a lack of scientific evidence.

Juror #7:  Sure.

Prosecutor:  <u>It's not like you can't consider that at all</u>.

Juror #7:  Yeah.

Prosecutor:  But you believe what the witness was telling you, you will be able to say, "You know what? . . . I believe what they're telling me. I'm firmly convinced and I can find the defendant guilty.["]

Juror #7:  Yes.

21

[(Emphasis added).]

We do not quote some of the other sidebar exchanges with jurors that ultimately decided the case, but we note that frequently the prosecutor posed questions that focused on the juror's ability to consider the testimony of witnesses, decide credibility and convict if they believed that testimony.

Defense counsel here apparently did not object to the question and infrequently participated in any exchange with jurors at sidebar. We therefore apply the plain error standard. See, e.g., Winder, 200 N.J. at 252 (holding plain error regarding jury voir dire requires defendant "establish . . . there was error 'clearly capable of producing an unjust result'" (quoting State v. Burns, 192 N.J. 312, 342 (2007); R. 2:10-2)).

As in Little, in this case "[t]he questions posed to prospective jurors about [forensic evidence], . . . improperly suggested that jurors should not consider the absence [of such evidence] as a factor when they evaluated the State's proofs." 246 N.J. at 419. This was critical, because as in Little, where the State was unable to produce the gun used in the assault and the jury convicted the defendant based primarily on the testimony of witnesses, there the victims, so too here, the State's case relied almost entirely on Emanuel's testimony. The prosecutor's assertion that Emanuel's testimony was corroborated by other

evidence, i.e., cellphone records and surveillance footage, is true, but that evidence did not corroborate the State's essential contention that defendant, not Emanuel, nor his cousin Kennedy, shot Beckett.

Although Little was decided after the trial in this case, our jurisprudence has long recognized the importance of appropriate, impartial juror voir dire in "protecting a defendant's right to a fair trial." Winder, 200 N.J. at 251. More than fifty years ago, in State v. Manley, the Court adopted Rule 1:8-3(a), which then required trial judges to conduct jury voir dire but permitted the parties or their attorneys to "supplement the court's interrogation in its discretion." 54 N.J. 259, 281 (1969). In doing so, the Court sought to "restore the fundamental basis for preliminary questioning, i.e., an expedient selection of a fair and impartial jury, one that will decide the case fairly under the evidence presented and the instructions of the court." Id. at 280. Among other things, this meant

> eliminating . . . efforts to indoctrinate, to persuade, to instruct by favorable explanation of legal principles that may or may not be involved, to lecture on the law and the facts and the relation of one to the other, the lecture ending in a question for form's sake. It mean[t] also a prohibition of the hypothetical question intended and so framed as to commit or to pledge jurors to a point of view or a result before they have heard any evidence, argument of counsel or instructions of the court.
>
> [Id. at 280–81 (emphasis added).]

Because the question posed to jurors in this case sought to ensure they could convict defendant despite the absence of forensic evidence, but failed to ask if jurors understood a reasonable doubt could be raised by the lack of such evidence, it was not balanced as the Court required in Little. Instead, before hearing any evidence, the chosen jurors committed themselves to a one-sided proposition that inured to the State's benefit. We reverse.

IV.

Although our decision means we need not consider defendant's sentencing arguments, for the sake of completeness, we address the other arguments advanced, all of which are unavailing.

A.

The judge denied defendant's motion for judgment of acquittal at the end of the State's case, citing Emanuel's testimony, the surveillance video footage, and the medical examiner's testimony regarding the cause of Beckett's death. Giving the State the benefit of all favorable evidence and inferences, the judge concluded it was sufficient for a jury to find guilt beyond a reasonable doubt. See, e.g., State v. Reyes, 50 N.J. 454, 458–59 (1967). On appeal, we apply the same standard as the trial judge, State v. Cruz-Pena, 243 N.J. 342, 348 (2020),

and conduct our review de novo.  State v. Dekowski, 218 N.J. 596, 608 (2014). The judge properly denied the motion for acquittal for the stated reasons.

In support of his JNOV motion, defendant argued the verdicts were inconsistent, because although the jury found defendant guilty of murder, it acquitted him of the weapons offenses.  Defendant also contended the verdict meant the jury considered defendant was an accomplice, not a principal, but the judge failed to give any instructions on accomplice liability.  After considering oral argument and allowing the parties to brief the issue, the judge denied the motion.

"Inconsistent verdicts are accepted in our criminal justice system," and courts should not "speculate" whether the inconsistency resulted from jury lenity, compromise, or mistake.  State v. Banko, 182 N.J. 44, 53, 55 (2004) (citing State v. Grey, 147 N.J. 4, 11 (1996)).  "Rather, 'we [only] determine whether the evidence in the record was sufficient to support a conviction on any count on which the jury found the defendant guilty.'"  State v. Goodwin, 224 N.J. 102, 116 (2016) (quoting State v. Muhammad, 182 N.J. 551, 578 (2005)).  Applying that standard of review, the evidence was clearly sufficient to find defendant guilty of murder beyond a reasonable doubt.

Any alleged inconsistency does not mean the judge should have provided instructions on accomplice liability. As already noted, we refuse to speculate and attach specific reasons for an inconsistency in the verdict, but more important, the evidence did not support providing the charge. The State's entire case rested on Emanuel's testimony that defendant shot Beckett.[4]

Defendant alternatively moved before the judge for a new trial, again asserting the evidence viewed in its entirety was insufficient to support the murder conviction. See State v. Lodzinski, 246 N.J. 331, 358 (2021) (requiring the court consider not only the evidence presented by the State, but "the entirety of the evidence" (quoting State v. Williams, 218 N.J. 576, 594 (2014))). The judge denied the motion concluding "the key issue for the jury was what weight to assign to the credibility of . . . Emanuel," and the jury found him credible.

Rule 3:20-1 provides:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

---

[4] For this reason, the point defendant raises in his pro se supplemental brief regarding accomplice liability lacks any merit. R. 2:11-3(e)(2).

In reviewing a trial court's decision to grant a new trial following a jury verdict, an appellate court must be "'guided by essentially the same standard as that controlling the trial judge's review of a jury verdict' and must 'weigh heavily' the trial court's views on 'credibility of witnesses, their demeanor, and [the trial court's] general "feel of the case."'" State v. Brown, 118 N.J. 595, 604 (1990) (alteration in original) (quoting State v. Sims, 65 N.J. 359, 373 (1974)). Applying these standards, the judge properly denied defendant's motion for a new trial.

B.

Defendant argues the prosecutor's summation comments improperly shifted the burden of proof. Here are the objected-to portions of the summation:

> It's the State's burden. [Defense counsel] was 100 [%] correct about that. The State has the burden of proof. And the State's burden is to prove to you the elements of the offenses charged in the indictment. That means the State has to present facts, has to present testimony and evidence and exhibits to you to prove to you the elements of the charged counts in this indictment have been established.
>
> The State has to do no less than that. But it certainly has to do no more than that. And another thing that is true, the defendant does not have to produce any evidence at all because it is the State's burden.
>
> But if the [d]efense is going to argue to you that something else happened out in that wooded area off

27

East Stuyvesant Avenue, that somebody else, not the defendant, was the one who killed Lance Beckett, then the [d]efense damn well better be able to point to some evidence in the record to support that claim. They don't have to produce it, but they better be able to show it to you.

Shortly thereafter, the prosecutor reiterated, "[a]gain, the [d]efense doesn't have to produce evidence, but they better be able to point you to something that supports what they're saying. They can't do it."

Defense counsel objected after completion of the summation and requested a mistrial. The judge denied the motion finding the comments did not shift the burden of proof and almost immediately reminded the jury, "[t]he burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to a defendant."

"Whether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Winter, 96 N.J. 640, 646–47 (1984)). Defense counsel's summation pointed an accusatory finger toward Emanuel or some other person as the shooter. The prosecutor's comments were a response. See State v. Mahoney, 188 N.J. 359,

28

376 (2006) (finding although prosecutor's comments placed an "unforgiving and harsh glare" on the asserted defense, they were not impermissible).

Here, the prosecutor tread dangerously close to suggesting defendant had a burden to produce evidence supporting any claim that another person shot Beckett. Such comments should not be repeated if the case is retried. But, the judge exercised his discretion by quickly addressing the issue with a strong curative instruction, and his decision to deny a mistrial does not merit reversal.

Reversed. We vacate defendant's conviction and remand for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0514-18